# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE LEADER'S INSTITUTE, LLC and DOUG STANEART, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:14-CV-3572-B |
| ROBERT JACKSON, MAGNOVO TRAINING GROUP, LLC, COLETTE JOHNSTON, and SHORT SPLICE, INC., | § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions to dismiss for lack of personal jurisdiction, one of which moves in the alternative for a transfer of venue to the U.S. District Court for the Southern District of Indiana. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion to Dismiss Plaintiffs' First Amended Original Complaint Pursuant to Fed. R. Civ. P. 12(b)(2) (doc. 39) filed by Defendants Robert Jackson and Magnovo Training Group, LLC, which as explained below, results in the partial dismissal of the claims against these defendants and a denial of their alternative request for a venue transfer. Also discussed below, the Court **GRANTS** the Motion to Dismiss for Lack of Personal Jurisdiction (doc. 41) filed by Defendants Colette Johnston and Short Splice, Inc., and dismisses the claims against these defendants in their entirety.

## I.

## BACKGROUND

This case was brought by Plaintiffs The Leader's Institute, LLC ("TLI"), a Texas company

-1-

headquartered in Arlington, Texas, and Doug Staneart ("Staneart"), a Texas resident and the founding owner and CEO of TLI. Doc. 36, Pls.' First Am. Compl. ("Am. Compl.") ¶¶ 1, 2, 45. Plaintiff TLI is "in the business of conducting corporate leadership, team-building and public speaking seminars." *Id.* ¶¶ 45-47. Integral to TLI's business are the various pieces of intellectual property owned by Plaintiffs, including registered trademarks for "Build-A-Bike®" and "BUILD-A-BIKE®," registered copyrights for materials used in TLI's presentations, and customer information lists that Plaintiffs maintain on a password-protected system housed in Texas. *See id.* ¶¶ 48, 52-65.

Plaintiffs filed this action against Defendants Robert Jackson ("Jackson"), Magnovo Training Group, LLC ("Magnovo"), Colette Johnston ("Johnston") and Defendant Short Splice, Inc. ("Short Splice"), who together have allegedly exploited Plaintiffs' intellectual property in such ways that allow them to unfairly compete with TLI in the corporate seminar industry. Defendants, who all hail from out of state, have filed two separate motions attempting to prevent Plaintiffs from further pursuing the claims filed against them in this jurisdiction. The Court begins its review of these motions with a background discussion of the relevant facts regarding each pair of movants.[1]

A.      *Background: Defendants Jackson and Magnovo*

The first motion at issue was filed by Defendants Jackson and Magnovo. Jackson is a resident of Indiana, and has never lived or owned real estate in Texas. Doc. 40-1, Defs. Jackson's & Magnovo's App. Supp. Mot. ("Defs. Jackson's & Magnovo's App.") at 3 (Ex. A, Jackson Aff. ¶¶ 4-5). He is also the President and owner of Magnovo, which was registered as a limited liability company

---

[1] As discussed in more detail *infra*, this background discussion is guided by the applicable standard of review, which requires the Court to accept "all undisputed facts submitted by the plaintiff" and resolve "all facts contested in the affidavits" and other attachments "in favor of jurisdiction." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)).

under the laws of Indiana in August 2009, and has remained headquartered there since. Defs. Jackson's & Magnovo's App. 7-8 (Ex. B, Jackson Aff. ¶¶ 3, 6).

Though Jackson served as an independent contractor for TLI as far back as 2006, he had a falling out with Plaintiffs in 2009, and his conduct during this initial relationship does not appear to be relevant to the present case. *See* Am. Compl. ¶ 70; Doc. 45, Pls.' App. Supp. Resp. Defs. Jackson's & Magnovo's Mot. ("Pls.' App. Opp'n Jackson's & Magnovo's Mot.") at 3 (Ex. A, Staneart Aff. ¶¶ 10-11). Instead, the conduct relevant to this case dates back to September 2010, at which time Jackson began reaching out to Staneart in Texas in an effort to re-establish his relationship with TLI. Pls.' App. Opp'n Jackson's & Magnovo's Mot. 3 (Ex. A, Staneart Aff. ¶ 12). Jackson continued to contact Staneart in both October and November of 2010, "offering to instruct classes [as a contractor for TLI] whenever available across the United States and to pay his own travel expenses." *Id.* at 4 (Ex. A, Staneart Aff. ¶¶ 13, 14). Staneart accepted Jackson's proposal in November 2010, and that month, Jackson flew to Texas at his own expense to lead a TLI event for a customer in Texas. *Id.* (Ex. A, Staneart Aff. ¶¶ 14, 15). During his trip, Jackson also met with Staneart in person, and continued to lobby for his return to TLI. *Id.* (Ex. A, Staneart Aff. ¶¶ 16, 17). In the face of "Jackson's persistent pleading," Staneart eventually "agreed to give Jackson a second chance as an independent contractor." *Id.*

Subsequently, Jackson signed a written agreement with TLI, and returned the contract to Staneart "in Texas via facsimile on approximately April 4, 2011." *Id.* (Ex. A, Staneart Aff. ¶ 18); *see also id.* at 13 (Ex. A-3, Agreement Dated 2/1/2011). This agreement was labeled "Independent Contractor Agreement" at the top, and provided, among other things, that client lists and instructional materials are the intellectual property of TLI, and that Jackson agreed not to use such

-3-

materials "to compete with TLI for a period of 18 months" following termination. *Id.* at 13.

Pursuant to his Independent Contractor Agreement, Jackson thereafter began performing team building and leadership seminars for TLI's clients, and selling its services to prospective and established customers. *Id.* at 5 (Ex. A, Staneart Aff. ¶ 20). Jackson performed most of his work for TLI remotely—from his home in Indiana. *See* Defs. Jackson's & Magnovo's App. 5 (Ex. A, Jackson Aff. ¶ 17). Nevertheless, Plaintiffs show that, over the course of his relationship with TLI, Jackson contacted at least forty-seven Texas residents trying to sell TLI's services and collect a commission for himself, completed sales to these Texas customers on at least twenty-three occasions, and conducted eight seminars or workshops in Texas for TLI's clients. Pls.' App. Opp'n Jackson's & Magnovo's Mot. 5-6 (Ex. A, Staneart Aff. ¶¶ 21-23); *id.* at 14-33 (Exs. A-4, A-5). During this time, Jackson was also given access to TLI's password-protected customer database in Texas, became certified to teach TLI workshops and classes, and was exposed to and made aware of TLI's registered trademarks and copyrighted works. *Id.* at 5-6 (Ex. A, Staneart Aff. ¶¶ 20, 24).

On August 1, 2013, Jackson sent Plaintiffs written notice, via email, that he was terminating their contractual relationship. *Id.* at 7 (Ex. A, Staneart Aff. ¶ 28). Just one week prior to Jackson's resignation, "the website for Jackson's company, Magnovo, was refreshed with changes that included listing several of TLI's customers as companies that trust Magnovo, implying that they were or are customers of Magnovo." *Id.* (Ex. A, Staneart Aff. ¶ 31). Then, later in August 2013, Jackson, only weeks after resigning, traveled to Texas to conduct a workshop for Magnovo. *Id.* at 6 (Ex. A, Staneart Aff. ¶ 26); Defs. Jackson's & Magnovo's App. 4 (Ex. A, Jackson Aff. ¶ 7). Plaintiffs allege that this workshop was held for one of TLI's long-standing Texas customers: Statoil Gulf Services, LLC ("Statoil"). Pls.' App. Opp'n Jackson's & Magnovo's Mot. 6 (Ex. A, Staneart Aff. ¶¶ 25-26).

-4-

Jackson and Magnovo admittedly contracted and performed at least two additional corporate workshops for Texas clients in October 2014, and while Plaintiffs are not aware of the identities of those customers, they believe both are former TLI customers, to whom Jackson gained access through his relationship with TLI. *See id.* at 6-7 (Ex. A, Staneart Aff. ¶ 27); Defs. Jackson's & Magnovo's App. 4 (Ex. A, Jackson Aff. ¶ 7).

Also following Jackson's departure from TLI, Plaintiffs claim that Jackson and Magnovo began "using numerous domain names, marks, phrases and terms that are identical or nearly identical to the Build-A-Bike® mark to advertise and sell charity team building and related services in direct competition with TLI." Pls.' App. Opp'n Jackson's & Magnovo's Mot. 8 (Ex. A, Staneart Aff. ¶ 34). These activities, Plaintiffs show, were carried out both on Magnovo's website and infringing domains registered by Jackson, such as www.letsbuildabike.com. *Id.* (Ex. A, Staneart Aff. ¶¶ 34-39); *id.* at 60-79 (Exs. A-7, A-8, A-9, A-10, & A-11). And though Defendants say they removed all infringing marks in response to Plaintiffs' cease and desist letter in September 2014, *see* Defs. Jackson's & Magnovo's App. 9 (Ex. B, Jackson Aff. ¶ 15), the record suggests that Defendants' websites are still infringing on Plaintiffs' marks in various ways. *See* Pls.' App. Opp'n Jackson's & Magnovo's Mot. 9 (Ex. A, Staneart Aff. ¶¶ 38-40); *id.* at 80-104 (Ex. A-12).

    B.    *Background: Defendants Johnston and Short Splice*

The second motion before the Court was filed by Defendants Johnston and Short Splice. Defendant Johnston is a resident of Florida, and like Jackson, formerly worked[2] for TLI on a remote

---

    [2] The parties dispute the legal characterization of Johnston's and TLI's former agency relationship: Johnston says she was an employee; TLI claims she was an independent contractor. As seen below, the issues presented herein do not require the Court to decide which of these two characterizations is applicable; it generally suffices to find that she was or was not an agent at relevant times in this case. As such, the Court

-5-

basis from Florida, without ever residing or owning real property in Texas. Doc. 42, Defs. Johnston's & Short Splice's App. Supp. Mot. ("Defs. Johnston's & Short Splice's App.") at 1-2 (Ex. A, Johnston Decl. ¶¶ 5-10). Johnston is also the owner and principal operator of Short Splice, a corporation she formed under the laws of Florida in 2011, where its principal operations have remained ever since. *Id.* at 2 (Ex. A, Johnston Decl. ¶ 7).

Johnston's relationship with TLI began in August 2008, around which time "TLI made some organizational changes" and decided to hire its subcontractors, including Johnston, directly. Docs. 47 & 48, Pls.' App. Supp. Resp. Defs. Johnston's & Short Splice's Mot. ("Pls.' App. Opp'n Johnston's & Short Splice's Mot.") at 3 (Ex. A, Staneart ¶ 10). Thereafter, Jackson worked for TLI for five years as a "Corporate Specialist," initially providing both instructor and sales services and later working solely in sales. *Id.* at 3-4 (Ex. A, Staneart Aff. ¶¶ 10, 16). As mentioned, Johnston performed most of these services for TLI remotely—from her home in Florida.

Plaintiffs, nonetheless, show that Johnston, during her five-year agency relationship with TLI, traveled to Texas on two different occasions: once for certification training as a TLI workshop instructor, and a second time to assist in a TLI workshop. *Id.* at 5 (Ex. A, Staneart Aff. ¶ 23). Plaintiffs also assigned Johnston as a sales agent for 368 prospective and established clients in Texas, for whom "she submitted detailed sales proposals and to whom she ultimately made numerous sales," which earned her the commissions she was paid by TLI. *Id.* at 5-6 (Ex. A, Staneart Aff. ¶¶ 24-26); *id.* at 20-156 (Exs. A-6, A-7, & A-8). Plaintiffs further point out that over Johnston's five-year tenure she submitted all payment requests to TLI's offices in Texas, received all payments from a

---

hereinafter attempts to refer to Johnston, where appropriate, as simply an "agent" of TLI.

-6-

bank located in Texas, and communicated with TLI's representatives and support personnel also located in Texas. *Id.* at 6-7 (Ex. A, Staneart ¶¶ 27-32); *id.* at 169-269 (Ex. A-15). In addition, Johnston's sales position afforded her access to TLI's client lists and other intellectual property, "all of which [was] kept on and accessed via TLI's company computers located in Arlington, Texas." *Id.* at 4 (Ex. A, Staneart Aff. ¶¶ 17, 18). Similarly, Johnston was provided a hard copy of TLI's 2013 corporate handbook, for which she signed a non-disclosure agreement dated April 16, 2013. *Id.* at 5 (Ex. A, Staneart Aff. ¶ 20). This agreement provides, in relevant part, that "[t]he information contained in this document contains trade secrets of [TLI],"[3] and that those "who receiv[e] this document, and the trade secrets contained within, ha[ve] a fiduciary responsibility . . . to protect and keep confidential these trade secrets." *Id.* at 17 (Ex. A-4, Agreement Dated 4/16/2013).

Unlike her relationship with TLI, Johnston denies that Short Splice ever had any sort of contacts or agency arrangement with TLI. *See* Defs. Johnston's & Short Splice's App. 4 (Ex. A, Johnston's Decl. ¶ 22). Plaintiffs, however, counter with averments from Staneart indicating that Johnston informed Plaintiffs in 2011 that she had formed Short Splice as a corporation, that her services from that point forward would be rendered "in her capacity as president of Short Splice," and that TLI should "pay all remuneration for her services directly to Short Splice." Pls.' App. Opp'n J & SS's Mot. 3 (Ex. A, Staneart Aff. ¶ 12). Plaintiffs additionally submit various documentation suggesting that the services Johnston provided to TLI were rendered in exchange for payments to her company, Short Splice. *See id.* at 11-16, 270-71 (Exs. A-1, A-2, A-3, A-16).

---

[3] The agreement defines "Trade Secrets" as including, "but not limited to, all client lists, sales and marketing strategies, and materials, instruction techniques, class and event materials, vendors, and the like." App. at 17 (Ex. A-4).

APP 091

In July 2013, Johnston ended her relationship with TLI, and began working for Defendant Magnovo, providing substantially the same services she performed at TLI. *Id.* at 7-8 (Ex. A, Staneart Aff. ¶¶ 33, 36); *id.* at 157 (Ex. A-9). Plaintiffs claim that Johnston began using the confidential and proprietary information she gathered at TLI to sell Magnovo's services to past and prospective customers of TLI. *See id.* at 8 (Ex. A, Staneart Aff. ¶¶ 37, 39). Though Johnston denies these allegations, Staneart counters that, shortly after Johnston's departure, he received multiple calls from clients, to whom Johnston previously sold services on TLI's behalf, who mistakenly contacted TLI to pay for upcoming events sold to them by Johnston, but not on TLI's behalf. *Id.* at 7 (Ex. A, Staneart Aff. ¶ 35). Plaintiffs further submit evidence of team building events held by Magnovo after Johnston's departure for customers in Michigan to whom Johnston previously sold TLI's services. *See id.* at 158-64 (Exs. A-10 & A-11). Lastly, Plaintiffs additionally highlight demand letters sent by Johnston's counsel to Plaintiffs in Texas regarding commissions that TLI allegedly failed to pay Johnston upon terminating her agency relationship. *See id.* at 9 (Ex. A, Staneart Aff. ¶ 40); *id.* at 18-19 (Ex. A-5).

C.    *Procedural History*

Based on the above allegations, Plaintiffs filed suit against all four Defendants in this Court on October 2, 2014. On December 30, 2014, Plaintiffs filed an Amended Complaint that is now before the Court, and which contains ten causes of action in total. Its first five causes of action are federal intellectual property claims asserted against Defendants Jackson and Magnovo, including claims for (i) trademark infringement under 15 U.S.C. § 1114(1), (ii) trademark counterfeiting under 15 U.S.C. §§ 1114 and 1116, (iii) statutory infringement and false designation of origin under 15 U.S.C. § 1125, (iv) Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), violations,

and (v) copyright infringement under 17 U.S.C. § 501 *et seq. See* Am. Compl. ¶¶ 136-75. The next three are state law claims filed against all four Defendants, including (vi) unfair competition by misappropriation, (vii) Texas Theft Liability Act violations, and (viii) trade secret misappropriation. *See id.* ¶¶ 176-99. The Amended Complaint's last two claims are also filed pursuant to state law, and charge Defendants Jackson and Johnston individually with (ix) breach of contract, and (x) tortious interference with prospective business relations. *See id.* ¶¶ 200-11.

On January 30, 2015, Defendants Jackson and Magnovo moved to dismiss the Amended Complaint's claims against them for lack of personal jurisdiction, or alternatively, to sever and transfer these claims to the U.S. District Court for the Southern District of Indiana, pursuant to 28 U.S.C. § 1404(a). *See* Doc. 39, Defs. Jackson's & Magnovo's Mot. Dismiss Pls.' First Am. Compl.; Doc. 40, Defs. Jackson's & Magnovo's Br. Supp. Mot. Dismiss ("Defs. Jackson's & Magnovo's Mot."). That same day, Defendants Johnston and Short Splice also moved to dismiss the Amended Complaint's claims asserted against them for lack of personal jurisdiction. *See* Doc. 41, Defs. Johnston's & Short Splice's Mot. Dismiss & Supp. Br. ("Defs. Johnston's & Short Splice's Mot."). Plaintiffs timely responded to both motions on February 20, 2015. *See* Doc. 44, Pls.' Resp. to Defs. Jackson's & Magnovo's Mot. Dismiss & Br. in Supp. ("Pls.' Br. Opp'n Jackson's & Magnovo's Mot."); Doc. 46, Pls.' Resp. to Defs. Johnston's & Short Splice's Mot. Dismiss & Br. in Supp. ("Pls.' Br. Opp'n Johnston's & Short Splice's Mot."). On March, 3, 2015, Defendants filed their respective replies. *See* Doc. 52, Defs. Jackson's & Magnovo's Reply ("Defs. Jackson's & Magnovo's Reply"); Doc. 53, Defs. Johnston's & Short Splice's Reply ("Defs. Johnston's & Short Splice's Reply").

Defendants' motions, then, are now ripe for the Court's review. In doing so below, the Court starts with the respective challenges made to its personal jurisdiction over the Defendants, and then

moves to Defendants Jackson's and Magnovo's request, in the alternative, for a transfer of venues.

## II.

## PERSONAL JURISDICTION

The Court begins by addressing the two pending motions to dismiss for lack of personal jurisdiction filed by Defendants Jackson and Magnovo, and Defendants Johnston and Short Splice, respectively. After reviewing the applicable law in the first subsection that follows, the Court will consider the contentions made by the parties regarding personal jurisdiction in this case.

A.    *Legal Standard: Authority to Assert Personal Jurisdiction over Non-residents in Texas*

Federal Rule of Civil Procedure 12(b)(2) allows defendants to move to dismiss claims brought against them for lack of personal jurisdiction. In resolving a Rule 12(b)(2) motion, the Court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). Parties "seeking to invoke the power of the court bea[r] the burden of proving that jurisdiction [over the moving defendant] exists." *Luv n' Care*, 438 F.3d at 469. But plaintiffs are not required to "establish jurisdiction by a preponderance of the evidence; a prima facie showing suffices." *Id.* at 469. Moreover, any factual conflict contained in the parties' submissions must be resolved in the plaintiff's favor. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

Two preconditions must be satisfied before this Court may assert personal jurisdiction: (1) the defendant must be amenable to service of process under Texas' long-arm statute, and (2) the assertion of jurisdiction over the defendant must comport with the Due Process Clause of the United States Constitution. *Jones v. Petty–Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992). Because Texas' long-arm statute has been held to extend to the limits of due process, only the

-10-

second jurisdictional precondition must be examined. *Id.* at 1067-68 (citing, *inter alia, Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)). For personal jurisdiction to comport with due process, the defendant, "if he be not present within the territory of the forum, [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945) (citations and quotation marks omitted).

In determining whether such non-resident defendants have had sufficient "minimum contacts" with the forum state, courts "have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn. 8, 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). General jurisdiction allows courts "to hear any and all claims against [a defendant]" based on that defendant's "continuous and systematic" contacts with that forum. *Id.* (citing *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction, by contrast, is based on the proposition "that 'the commission of some single or occasional acts of the [defendant] in a state' may sometimes be enough to subject the [defendant] to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014) (quoting *Int'l Shoe*, 326 U.S. at 318).

B.     *Analysis: General Jurisdiction*

The Court begins its analysis by quickly disposing of general jurisdiction as a basis for personal jurisdiction over any of the four Defendants in this case. Recent Supreme Court precedent has made clear "that the proper consideration when determining general jurisdiction is whether the defendant's 'affiliations with the State are so continuous and systematic as to render it essentially at home in the

forum State.'" *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (quoting *Daimler*, 134 S. Ct. at 761; *Goodyear*, 131 S. Ct. at 2851) (bracket omitted). This standard makes it "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business" of a business entity, or the residence of an individual. *Id.* (citing *Daimler*, 134 S. Ct. at 760; *Helicopteros Nacionales*, 466 U.S. at 414 nn. 8, 9).

In this case, Plaintiffs do not appear to argue that general jurisdiction is proper over any of the four Defendants, each of whom hails from outside of Texas. But even if they did, none of the Defendants have contacts with Texas that "are so 'continuous and systematic' as to render [them] essentially at home in the forum State." *Daimler*, 134 S. Ct. at 761 (citing *Goodyear*, 131 S. Ct. at 2851). Therefore, general jurisdiction is clearly not a proper constitutional basis for asserting personal jurisdiction in this forum over any of the non-resident Defendants.

C.    *Analysis: Specific Jurisdiction*

The Court, then, focuses the remainder of its analysis on whether personal jurisdiction over the Defendants comports with due process under the specific jurisdiction analysis. The specific jurisdiction analysis "'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed.2d 790 (1984)). In the Fifth Circuit, courts generally employ a three-step test in analyzing specific jurisdiction, requiring "(1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 753 F.3d 521, 540 (5th Cir. 2014) (citing *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012)).

APP 096

Plaintiffs bear the burden of making out a *prima facie* case with respect to the first two prongs of the specific jurisdiction analysis. *Monkton*, 768 F.3d at 433 (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). The "touchstone" of the minimum contacts test under the first prong "is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'" *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Luv N' Care*, 438 F.3d at 470). "This requirement can be satisfied by showing that the defendant purposefully directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there." *ITL Int'l*, 669 F.3d at 498 (citation and quotation marks omitted). While specific jurisdiction is possible even if the defendant's forum contacts "are only isolated or sporadic," the relevant contacts "must be more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person.'" *Id.* at 498-99 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)).

Under the second prong, Plaintiffs must show that their claims are based on "'alleged injuries that arise out of or relate to those activities'" on which the defendant's minimum contacts are established. *Chinese-Manufactured Drywall Products*, 753 F.3d at 543 (*Burger King*, 471 U.S. at 472). In other words, there must be a sufficient "nexus between the defendants' contacts with [the forum state] and the plaintiffs' [underlying] claims." *ITL Int'l*, 669 F.3d at 500. The Fifth Circuit has suggested that this flexible standard aims to both ensure a "'causal nexus between the [alleged] conduct and the purposeful contact'" and account for "'the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests.'" *Chinese-Manufactured Drywall Products*, 753 F.3d at 543 (quoting *Oilfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1223, 1224 (11th Cir. 2009)).

APP 097

If Plaintiffs satisfy their burden at the first two prongs, the burden shifts to the Defendants to show that asserting specific jurisdiction over them is unfair or unreasonable. *Monkton*, 768 F.3d at 433. The Fifth Circuit has observed that "'it is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown.'" *McFadin*, 587 F.3d at 759-60 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)) (brackets in original). The factors considered under this prong include: "'(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) he plaintiff's interest in securing relief, (4) the interest of interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.'" *Id.* at 760 (quoting *Luv N' Care*, 438 F.3d at 473).

Having set forth the applicable law, the Court turns now to the specific jurisdiction contentions asserted in this case. Since personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State," *Walden*, 134 S. Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475) (emphasis in original), the Court individually considers the relevant assertions made for each of the four Defendants, as follows:

## 1.    Defendant Jackson

The Court first addresses the parties' contentions as to whether specific jurisdiction over Defendant Jackson is proper. Plaintiffs submit that Jackson engaged in a number of contacts with Texas relevant to this suit, for which they claim that specific jurisdiction over Jackson is proper. *See* Pls.' Br. Opp'n Jackson's & Magnovo's Mot. 7-10. The Court summarizes these contacts as follows: (1) Jackson's efforts to re-establish his independent contractor relationship TLI through a series of telephone calls to Staneart in Texas between September and November 2010; (2) Jackson's trip to Texas in November 2010 taken at his own expense, where he performed a TLI team building event

and met with Staneart in person to continue to lobby for a renewed relationship with TLI; (3) the

Independent Contractor Agreement that Jackson signed with TLI in February 2011, and returned

to Staneart in Texas; (4) the contacts Staneart had with TLI's Texas-based clients pursuant to his

Independent Contractor Agreement, including forty-seven Texas customers he contacted in an effort

to sell TLI's services, twenty-three Texas customers to whom he sold TLI's services, and eight

workshops that he conducted for TLI's customers in Texas; (5) Jackson's access to TLI's intellectual

property in Texas during his independent contractor relationship, including certification training to

teach team building workshops, his access to TLI's password-protected customer lists on servers in

Texas, and his exposure to TLI's registered trademarks; (6) Jackson's alleged breach of his

Independent Contract Agreement by selling Magnovo's competing services to TLI's customers in

Texas while purporting to service those customers on TLI's behalf; (7) the three team building

workshops Jackson conducted in Texas on behalf of Magnovo after leaving TLI, including one the

same month he terminated his relationship with TLI for its former repeat customer Statoil; (8) the

update Jackson made to the website of his company, Magnovo, just one week before terminating his

relationship with TLI, in which he referenced TLI's customers in a way that suggested they were

actually Magnovo's customers; (9) the webpages Jackson created for Magnovo's website that

specifically targeted Texas cities for team building events; (10) the domains that Jackson registered

on behalf of Magnovo after leaving TLI that allegedly infringe on Plaintiffs' registered trademarks;

(11) the infringing marks Jackson included on Magnovo's website; and (12) the direct harm Jackson

intentionally caused Plaintiffs in Texas. *See id.* 8-9.

Jackson counters with averments of his own regarding at least some of the above contacts.

For example, while conceding that he performed seminars for Magnovo in Texas after leaving TLI

in August 2013, Jackson avers that these seminars were performed for "clients that were not solicited from any client list of [Plaintiffs], but from other contacts who requested [Jackson's] services." Defs. Jackson's & Magnovo's App. 4 (Ex. A, Jackson Aff. ¶ 7). Jackson further claims that the few Texas seminars he has conducted on behalf of Magnovo are minimal compared to the seventy-eight total he has conducted nationwide since that time. *Id.* (Ex. A, Jackson Aff. ¶ 8). Jackson additionally says that he removed "all occurrences of 'build a bike' from all of [his] websites, domains, and other marketing materials" in response to Plaintiffs' cease and desist letter received in September 2014. *Id.* (Ex. A, Jackson Aff. ¶ 12). He also denies: signing TLI's Independent Contractor Agreement, using any of TLI's client lists post-August 2013, directly soliciting business from any of TLI's clients on behalf of Magnovo, using Plaintiffs' copyrighted materials without their consent, or receiving any trade secrets from Plaintiffs. *Id.* at 4-5 (Ex. A, Jackson Aff. ¶¶ 13-17). For these reasons, Jackson argues that Plaintiffs have failed to demonstrate that he engaged in minimum contacts purposefully directed at Texas, or that his forum contacts are sufficiently related to the claims asserted against him. *See* Defs. Jackson's & Magnovo's Mot. 13-19; Defs. Jackson's & Magnovo's Reply 2, 3-6.

In determining whether it may exercise specific jurisdiction over Jackson, the Court divides its below discussion based on the different groups of claims asserted against Jackson and the relevant contacts underlying each group. *See Seiferth*, 472 F.3d at 275 ("[I]f a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim.").

### i.   *Trademark and Anticybersquatting claims*

The Amended Complaint's first four causes of action allege, respectively, trademark infringement, trademark counterfeiting, false designation of origin, and cybersquatting on the part of Jackson. These four claims primarily arise from Jackson's internet-based misconduct, including his

alleged display of marks similar or identical to Plaintiffs' registered trademarks on the website of his

company, Magnovo, and Jackson's registration of internet domains allegedly designed in a way to

profit from Plaintiffs' registered marks and divert business from Plaintiffs.

There does not appear to be any Supreme Court or Fifth Circuit precedent directly on point

here, that is, the Court is unaware of any binding cases applying the minimum contacts test in the

context of trademark-related claims of this nature. That said, district courts throughout Texas "have

repeatedly held that 'the exercise of specific personal jurisdiction over an individual for his Internet

activities, including allegations of trademark infringement and cybersquatting, is proper when a

defendant intentionally directs his tortious activities toward the forum state.'" *First Fitness Int'l, Inc.*

*v. Thomas*, 533 F. Supp. 2d 651, 656 (N.D. Tex. 2008) (Godbey, J.) (quoting *Carrot Bunch Co. v.*

*Computer Friends, Inc.*, 218 F. Supp. 2d 820, 826 (N.D. Tex. 2002) (Buchmeyer, J.); citing *Global*

*360, Inc. v. Spittin' Image Software, Inc.*, No. 3:04–CV–1857–L, 2005 WL 625493, at *7 (N.D. Tex.

Mar. 17, 2005) (Lindsay, J.)) (brackets omitted).[4]

In *First Fitness*, for example, another court in this District held that personal jurisdiction over

two non-resident defendants was proper based on evidence showing that the defendants "acted

knowing that their use of [the plaintiff's] trademarks [on their websites] would cause harm in Texas."

*Id.* at 654. The evidence on which the court relied in reaching this conclusion included the fact that

the defendants previously maintained a "close relationship" with the plaintiff as one of its primary

---

[4] *See also IntelliGender, LLC v. Soriano*, No. 2:10-CV-125-TJW, 2011 WL 903342, at *12 (E.D. Tex.
Mar. 15, 2011) ("As in *First Fitness*, the plaintiff has presented a prima facie case that Defendant HelloBaby
has purposefully directed its activities at this forum by intentionally undertaking the tortious actions in an
attempt to divert customers away from the plaintiff with intimate knowledge of the plaintiff, its location in
Texas, and its valuable trademark rights and trade secrets.").

distributors, and that over the course of this relationship the defendants visited Texas on at least one occasion, received orders from Texas, and had other business-related contacts with Texas. *Id.* at 656. The court also found significant that the defendants "purported to operate their website from [a potentially false address] within Texas" just prior to learning of the plaintiff's impending suit. *Id.*

Similarly, in this case, Plaintiffs have shown that Jackson employed marks similar or identical to Plaintiffs' registered trademarks on websites specifically targeting Texas residents for purposes of procuring customers from TLI in Texas. From his long-standing business relationship with Plaintiffs, which ended shortly before the trademark violations allegedly began, the Court can infer that Jackson intended his alleged conduct to impact Plaintiffs in Texas—by diverting business from them to Magnovo—and to reach Plaintiffs' robust customer base in this forum. Indeed, during his time as an independent contractor with TLI, Jackson contacted numerous customers based in Texas, sold TLI's services to over twenty of these contacts, and traveled to Texas on at least eight occasions to teach workshops. These customers were comprised of a distinct group of individuals and entities: those in the market for corporate team building and leadership services. And it was this same group of potential clients that Jackson began specifically targeting soon after terminating his relationship with Plaintiffs. In doing so, Jackson employed marks identical or similar to the Build-a-Bike mark that he had witnessed TLI successfully use to attract clients in the very industry he targeted on Magnovo's behalf.

In addition to these contacts, Plaintiffs further show that Jackson had multiple direct contacts with Texas following his departure from TLI. Specifically, Plaintiffs highlight that Jackson admittedly traveled to Texas on three separate occasions to perform team building events on Magnovo's behalf. And at least one of these events, Plaintiffs assert, was held for Statoil—a former long-standing

customer of Plaintiffs. While not definitive, this evidence is enough to suggest, at this early stage in

the case, that Jackson not only caused purposeful harm to Plaintiffs in Texas, but intentionally used

Plaintiffs' established trademarks to divert business from Plaintiffs in Texas, among other places.

To counter this evidence of his seemingly purposeful contacts, Jackson argues that his "use

of the internet to advertize [Magnovo's] services throughout the nation, including Texas," was not

purposeful, because his internet activities fall on the passive side of the sliding scale test set forth in

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). Defs. Jackson's &

Magnovo's Mot. 17-18. Though not directly on point here, the Fifth Circuit has indeed drawn upon

this so-called "*Zippo* sliding scale when a plaintiff argues that personal jurisdiction exists due to a

defendant's website." *Monkton*, 768 F.3d at 432 (citing *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir.

2002)). The aim of the *Zippo* sliding scale is to "measure an internet site's connection to a forum

state," which it attempts to do using a three-point spectrum of connectivity that includes: (i) a low-

end marker for "passive" websites whose internet-based contacts are not sufficient to establish

personal jurisdiction; (ii) a middle point for "sites with some interactive elements" that require

deeper examination to determine whether such interactivity creates minimum contacts; and (iii)

lastly, a high-end marker for websites that "engage in repeated online contacts with forum residents,"

for which personal jurisdiction is typically appropriate. *Revell*, 317 F.3d at 470 (discussing *Zippo*, 952

F. Supp. at 1124). Importantly, while the *Zippo* sliding scale remains a "factor in an internet-based

personal jurisdiction analysis," the Fifth Circuit has more recently intimated that "internet-based

jurisdictional claims must continue to be evaluated on a case-by-case basis, focusing on the nature

and quality of online and offline contacts to demonstrate the requisite purposeful conduct that

establishes personal jurisdiction." *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214,

227 n.7 (5th Cir. 2012) (internal citation omitted).

Applying the guidance from these internet-based jurisdictional cases to these circumstances, the Court finds further support for its above conclusion that Jackson engaged in purposeful minimum contacts relevant to the trademark claims asserted against him in this forum. As an initial matter, despite his generalized assertions that his company's website falls on the "passive" side of the *Zippo* sliding scale, Plaintiffs have presented evidence indicating that Jackson's internet activities more closely resemble the "interactive" variety set forth in *Zippo*. Specifically, Plaintiffs show that the website at issue does not simply advertise in Texas or provide general information accessible to Texas residents, but rather, the site allows users to request a quote, after which—in the words of the website itself—"one of [Magnovo's] specialists will contact you shortly." Pls.' App. Opp'n Jackson's & Magnovo's Mot. 47. This is the sort of exchange of commercial information that the *Zippo* sliding scale appears to contemplate under its "interactive" category. *See, e.g.*, *Revell*, 317 F.3d at 472 (finding a website to qualify as interactive on the *Zippo* sliding scale because it allowed users to "send information . . . and receive information . . . [on] an open forum hosted by the website").

Nevertheless, regardless of the "passive" or "interactive" nature of Jackson's internet activities under *Zippo*, the record reveals other relevant online and offline contacts that show Jackson's forum contacts were "sufficient" and "purposefully established." *Pervasive*, 688 F.3d at 221 (quotation marks and citations omitted). For example, Plaintiffs show that Jackson's website singles out Dallas on national and regional maps as a "key" city for team building events, and specifically identifies a number of Texas cities in which team building events are offered. The website even provides separate pages dedicated to these Texas cities, with information regarding the suitability of each city for team building events, particular locations within each city capable of hosting such events, and details as

-20-

to how prospective clients may go about booking such an event. This is all in addition to the offline contacts Jackson knowingly directed at this forum in an effort to glean Plaintiffs' customers in Texas using, among other things, the reputation and good will Plaintiffs built up around its registered trademarks. Accordingly, Jackson's internet-based contacts only bolster the case for exercising specific jurisdiction over him, and in no way diminish the Court's above findings.

Lastly, Jackson also purports to challenge Plaintiffs' showing at the second prong, arguing "[t]here is no sufficient nexus between [his] contacts with Texas and Plaintiffs' claims for infringement and anticybersquatting." Defs. Jackson's & Magnovo's Reply 5. Outside of this general assertion, however, Jackson offers no insight as to why he believes the connection between his forum contacts and Plaintiffs' trademark-related claims is too attenuated. Instead, the thrust of his attack here goes to the merits of Plaintiffs' claims. For example, Jackson contends that "the alleged trademark violation was ceased prior to filing this lawsuit, so there is no cause of action that existed when this lawsuit was filed."[5] Defs. Jackson's & Magnovo's Mot. 18. But even assuming such assertions are relevant to the personal jurisdiction analysis,[6] they would not defeat specific jurisdiction over Jackson for present purposes. As discussed, Plaintiffs need only establish a *prima facie* case of specific jurisdiction at this point, and all factual disputes must be resolved in their favor. *See, e.g.*, *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242 (5th Cir. 2008) (holding that "[b]ecause the district court did not conduct a full-blown evidentiary hearing, it should

---

[5] *See also* Defs. Jackson's & Magnovo's Reply (purporting to attack second prong with argument that "[t]here is no reason for Jackson to believe that build-a-bike was a registered trademark and was valuable solely to Plaintiffs' business when so many others in the industry were using it").

[6] *But see Seiferth*, 472 F.3d at 276 (rejecting argument under the second prong, because it did "not bear on the jurisdictional question, but rather [went] to the merits of [the plaintiff's] claims").

have required [the plaintiff] to establish only a prima facie case for personal jurisdiction"). And since Plaintiffs' allegations, affidavits, and documentary evidence controvert each of Jackson's veiled attacks on the merits of their claims, the Court need not explore this issue further at this time. Therefore, the Court concludes that Plaintiffs have made out a *prima facie* case of specific personal jurisdiction over the trademark and anticybersquatting claims asserted against Jackson.

### ii.    *Copyright infringement claim*

The Court next considers whether Plaintiffs have made out a *prima facie* case of specific jurisdiction over Jackson for purposes of their federal copyright infringement claim. This claim is based on Jackson's and Magnovo's purported use of Plaintiffs' copyrighted leadership principles and presentation manuals without Plaintiffs' authorization. *See* Am. Compl. ¶¶ 55, 166-75. But aside from a handful of conclusory allegations, *see id.*, the Amended Complaint offers no insight into the facts underlying this claim. One could arguably infer that this claim intends to charge Jackson with employing copies or derivative versions of the copyrighted materials during events conducted on behalf of Magnovo, but even then, Plaintiffs would have fallen short in showing that such conduct took place in Texas. In fact, Plaintiffs' brief appears to altogether omit any discussion of the Court's specific jurisdiction over Jackson as it relates to the Amended Complaint's copyright claim.[7]

Given this lackluster showing, the Court cannot find that Plaintiffs have established a *prima facie* case of specific jurisdiction over their federal copyright claim asserted against Jackson. In contrast to the presentation they made with respect to their trademark and anticybersquatting

---

[7] While Plaintiffs arguably mean to include the copyright claim in the "Specific Jurisdiction Over Infringement and Anticybersquatting Claims" section of their brief, there is no discussion in this section as to Jackson's alleged copyright violations or cases addressing specific jurisdiction over federal copyright claims.

APP 106

claims, Plaintiffs make no attempt to connect Jackson's alleged copyright infringement to Texas, or his alleged Texas contacts to the copyright infringement allegations. Moreover, the mere fact that Plaintiffs' felt the effects of the alleged infringement in Texas is not enough, on its own, to establish specific jurisdiction over Jackson in this context. *See, e.g.*, *Papa Berg, Inc. v. World Wrestling Entm't, Inc.*, No. 3:12-CV-2406-B, 2013 WL 2090547, at *8 (N.D. Tex. May 15, 2013) (holding that "even considering the alleged harm to" the plaintiff, a Texas resident, as a result of the defendants' alleged copyright infringement, "the effects test alone does not support personal jurisdiction over the [defendants]"). Based on these deficiencies, the Court is unable to conclude that personal jurisdiction over Jackson is proper for purposes of adjudicating the Amended Complaint's federal copyright infringement claim.

### iii.    State law claims

The last claims the Court must address, in evaluating its authority to exercise specific jurisdiction over Jackson, are Plaintiffs' five state law actions, which include unfair competition by misappropriation, trade secret misappropriation, Texas Theft Liability Act violations, breach of contract, and tortious interference with prospective business relations. These five claims, Plaintiffs point out, "all arise out of and relate to [Jackson's alleged] use of Plaintiffs' customer contact lists" in violation of the state laws asserted. Pls.' Br. Opp'n Jackson's & Magnovo's Mot. 17.

Plaintiffs argue that personal jurisdiction over Jackson is proper for purposes of these five state law claims mainly because of Jackson's purposeful contacts in this forum leading up to the misconduct at issue. In particular, Plaintiffs highlight Jackson's repeated attempts to re-establish an independent contractor relationship with Plaintiffs in Texas, the written agreement that came out of these efforts, and the numerous contacts Jackson had with Plaintiffs' Texas customers pursuant

to this contractual arrangement. *See id.* at 17-18. Plaintiffs argue that these contacts all relate to the "access" Jackson gained with respect to Plaintiffs' protected customer lists, which he later exploited in allegedly violating the various state laws asserted. *Id.* Additionally, Plaintiffs rely on the fact that "Defendants admittedly sold and provided their competing services to Texas residents, which included [TLI's] repeat customer, StatOil, and likely others." *Id.* at 18. Plaintiffs allege that Jackson unlawfully procured this and other business in Texas using Plaintiffs' protected customer lists "both during and after Jackson terminated his relationship with TLI." *Id.* at 17. "Such activities in Texas," Plaintiffs contend, "gave rise to each of the [state law] causes of action" brought against Jackson. *Id.*

Based on the above assertions, the Court determines that Plaintiffs have carried their burden of establishing the first two prongs of specific jurisdiction analysis as it relates to the five state law claims brought against Jackson. As the Supreme Court has long held, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473, 105 S. Ct. at 2182 (quoting *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647, 70 S. Ct. 927, 929, 94 L. Ed. 1154 (1950)). And in this case, Plaintiffs show that it was Jackson's purposeful actions—in particular, his repeated pleas to Staneart in Texas, both over the phone and in person—that led to the formation of the parties' long-standing business relationship underlying the state law claims at issue. Jackson, furthermore, entered this relationship with the express understanding that he would not use Plaintiffs' customer contacts in competition with Plaintiffs for eighteen months following his termination, as demonstrated by the written contract he signed and returned to Plaintiffs in Texas. Nevertheless, Plaintiffs show that Jackson, thereafter, exploited his ongoing relationship with Plaintiffs to gain extensive access to their current and

prospective clients based in Texas and elsewhere, only to later use these contacts to compete with Plaintiffs in violation of the parties' express written agreement. Based on these purposeful contacts with Texas, all of which give rise or relate to Plaintiffs' state law claims, the Court concludes that Jackson's "'conduct and connection with [Texas] are such that he should reasonably anticipate being haled into court there.'" *Burger King*, 471 U.S. at 474, 105 S. Ct. at 2183 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S. Ct. 559, 566, 62 L. Ed. 2d 490 (1980)).

None of Jackson's contrary assertions defeat this *prima facie* showing made by Plaintiffs. For example, Jackson emphasizes that his work for TLI was primarily performed from his home in Indiana, and that the contacts he did have with Texas, both during his relationship with TLI and after, were "very minimal and sporadic." Defs. Jackson's & Magnovo's Reply 2, 5; *see also* Defs. Jackson's & Magnovo's Mot. 13-14. This argument, however, ignores that "specific jurisdiction may exist where there are only isolated or sporadic contacts." *ITL Intern*, 669 F.3d at 499-500 (citations omitted). Indeed, the Court determined above that Jackson had the requisite "minimum contacts," not because his contacts added up to some arbitrary quantity, but because the nature of his contacts suggests he purposefully availed himself of the privileges of this forum. *See Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183 (explaining that the "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person") (internal quotation marks and citations omitted); *Gustafson v. Provider HealthNet Servs., Inc.*, 118 S.W.3d 479, 483-84 (Tex. App. 2003) ("In analyzing minimum contacts, it is not the number but rather the quality and nature of the nonresident defendant's contacts with the forum state that are important.").

Jackson's repeated assertions that go to the merits of Plaintiffs' state law claims are similarly

APP 109

unavailing.[8] As discussed before, the Court cannot accept such assertions at this point in the proceedings, as they run contrary to Plaintiffs' *prima facie* allegations and proof. *See Walk Haydel & Associates*, 517 F.3d at 241 ("[U]nless there is a full and fair hearing, [a district court assessing personal jurisdiction] should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts.") (citations omitted).

Lastly, the Court also finds unpersuasive Jackson's contentions that Plaintiffs' state law claims do not arise from or relate to his Texas contacts that pre-date his alleged misconduct.[9] Jackson cites no authority for the proposition that contacts pre-dating the alleged wrongdoing underlying a claim are unrelated to that claim as a matter of law. On the contrary, the Supreme Court in *Burger King* found a breach of contract claim arose out of or related to the defendant's efforts to reach into the forum state and negotiate a long-term contract with a forum resident, even though these contacts all occurred *before* the misconduct at issue took place.[10] 417 U.S. at 466-68, 479-80, 105 S. Ct. at 2179-80, 2186. Similarly, here, Plaintiffs' five state law claims arise out of or relate to the long-term

---

[8] *See, e.g.*, Defs. Jackson's & Magnovo's Mot. 18 (arguing that the "alleged copy of an independent contractor agreement" produced by Plaintiffs "is fraudulent because it was not signed by Jackson"); *id.* at 18-19 (denying that Jackson has solicited any TLI clients or otherwise used Plaintiffs' customer lists); *id.* at 19 ("Jackson has not been privy to any trade secrets of Plaintiffs, and therefore could not misappropriate them.").

[9] *See, e.g.*, Defs. Jackson's & Magnovo's Mot. 14 ("Plaintiffs attempt to argue past activities in the State of Texas as though those activities are at issue, but do not show how those activities were the cause of the alleged injuries that are related to their alleged complaints."); Defs. Jackson's & Magnovo's Reply 5-6 ("Plaintiffs rely on Jackson's work as an independent contractor with TLI for several years prior to his resignation . . . . However, the claims in this case arise from Jackson's alleged actions taken after his resignation in August 2013.").

[10] *See also Havel v. Honda Motor Europe Ltd.*, No. CIV.A. H-13-1291, 2014 WL 4967229, at *10 (S.D. Tex. Sept. 30, 2014) ("Although the connection between a defendant's suit-related conduct and the forum state will clearly be strongest when that conduct forms one of the elements of the intentional tort alleged[,] . . . [the Supreme Court has] not limit[ed] 'suit-related conduct' to the elements of a tort.") (citing *Walden*, 134 S.Ct. at 1123–24).

contract that was formed as a result of Jackson's purposeful efforts to create an ongoing business relationship with TLI in Texas. Even though much of Jackson's alleged misconduct occurred after this relationship ended, the parties' dispute nonetheless "grew directly out of a contract which had a substantial connection with [Texas]." *Burger King*, 417 U.S. at 479, 105 S. Ct. at 2186 (citation, quotation marks, and emphasis omitted). The Court, therefore, rejects Jackson's contentions that the nexus between these contacts and Plaintiffs' state law claims is inadequate. And as such, the Court reaffirms its above conclusion that Plaintiffs have established a *prima facie* case of specific jurisdiction over the state law claims asserted against Jackson.

### iv.    Fair and reasonable

To recap, the Court concludes that Plaintiffs have carried their burden of establishing the first two prongs of the specific jurisdiction analysis as it relates to all causes of action asserted against Jackson, with the exception of the copyright infringement claim. Plaintiffs' copyright claim aside, the burden now shifts to Jackson to demonstrate that "the assertion of personal jurisdiction would [not] comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S. Ct. at 2184 (citing *Int'l Shoe*, 326 U.S. at 320, 66 S. Ct. at 160).

On this point, Jackson offers no particular arguments as to why defending this suit in Texas would be unfair or unreasonable. Nor does he address the factors, detailed above, that courts typically consider under this third jurisdictional prong. Instead, he merely points to general inconveniences common to nearly all non-residents forced to defend suit in a forum outside their home state.[11] Such assertions fall well short of demonstrating the "rare" circumstances necessary to

---

[11] *See, e.g.*, Defs. Jackson's & Magnovo's Mot. 16 ("[R]equir[ing] Jackson to defend this lawsuit in Texas . . . is unduly burdensome and inconvenient, given that Jackson resides in Indiana and does not

satisfy the third prong of the specific jurisdiction analysis. *McFadin*, 587 F.3d at 759-60 (citation omitted). Accordingly, the Court finds that Jackson has failed to carry his burden of showing that the exercise of personal jurisdiction over him in Texas is unfair or unreasonable.

In sum, the Court concludes that Plaintiffs have established a *prima facie* case of personal jurisdiction over Jackson for purposes of adjudicating all claims asserted against him in the Amended Complaint, with the exception of Plaintiffs' copyright infringement claim, which is, therefore, subject to dismissal pursuant to Rule 12(b)(2). In all other respects, the Court denies Jackson's motion to dismiss for lack of personal jurisdiction based his failure to show that the Court's assertion of personal jurisdiction is unfair or unreasonable.

<u>2.</u>    <u>Defendant Magnovo</u>

The Court moves next to the issue of whether asserting specific personal jurisdiction over Defendant Magnovo accords with due process. The Court, of course, must evaluate personal jurisdiction here based on Magnovo's own contacts with Texas, rather than those attributable to Jackson alone. *See Rush v. Savchuk*, 444 U.S. 320, 332, 100 S. Ct. 571, 579, 62 L. Ed. 2d 516 (1980) (holding that while "[t]he parties' relationships with each other may be significant in evaluating their ties to the forum," the minimum contacts test "must be met as to each defendant over whom a state court exercises jurisdiction"). Nonetheless, Jackson's in-state contacts "may be relevant to the existence of specific jurisdiction" over Magnovo to the extent Jackson was acting as Magnovo's agent at the time. *Daimler AG*, 134 S. Ct. at 759 n.13 (citation and emphasis omitted).

Plaintiffs assert that Magnovo engaged in the following relevant contacts with Texas: (1)

---

maintain a presence in the state of Texas, and does not do business in Texas on a regular basis.").

"Magnovo expressly directed its infringing website at Texas residents, with knowledge of [TLI's] business, its registered trademark and its location in this forum"; (2) "Magnovo admittedly entered into at least three [] contracts with Texas residents and subsequently performed such contracts in the state of Texas"; and (3) "Magnovo's website is interactive and allows customers, including Texas residents, to request a quote for services and subsequently be contacted in Texas by a representative of Magnovo." Pls.' Br. Opp'n Jackson's & Magnovo's Mot. 10. As it did with Jackson, the Court proceeds to discuss whether these contacts are sufficient to confer specific jurisdiction over Magnovo with respect to the three groups of claims asserted against these two defendants.

First, in regards to their *trademark and anticybersquatting claims*, the Court finds that Plaintiffs have presented a *prima facie* case of specific jurisdiction over Magnovo. As they did for Jackson, Plaintiffs show that Magnovo purposefully directed its trademark infringing activities at customers in Texas via its interactive website, with the intention of harming Plaintiffs in Texas by diverting customers in this forum and elsewhere from TLI. Similarly, Plaintiffs demonstrate that Magnovo contracted to sell at least three seminars in Texas to former and/or prospective customers of TLI, which Jackson, acting on behalf of Magnovo, subsequently performed in this forum. Moreover, the Court, at this point in the proceedings, can infer that Magnovo's Texas seminars sufficiently relate to its alleged efforts to divert customers from TLI using the infringing marks and domains. For these reasons, the Court concludes that Plaintiffs have adequately demonstrated Magnovo's purposeful minimum contacts with Texas, as well as a sufficient nexus between these contacts and the trademark and anticybersquatting claims asserted.

Second, with respect to their *copyright infringement claim*, the Court conversely determines that Plaintiffs have not met their burden of establishing specific jurisdiction over Magnovo. Like with

-29-

Jackson, Plaintiffs make no effort to demonstrate a connection between Magnovo's alleged infringement and Texas or between Magnovo's Texas contacts and the alleged infringement. Likewise, the effects Plaintiffs allegedly felt in Texas as a result of Magnovo's infringement are not sufficient to establish specific jurisdiction in this context. Therefore, for the same reasons it found jurisdiction lacking over the copyright claim against Jackson, the Court determines that Plaintiffs have failed to show that personal jurisdiction is proper over the copyright claim against Magnovo.

Third, regarding their *state law claims* against Magnovo,[12] the Court additionally finds that Plaintiffs have not presented a *prima facie* case of specific jurisdiction over Magnovo. As an initial matter, most of Magnovo's forum contacts do not give rise or relate to the three state law claims alleged. Take, for example, Magnovo's internet activities directed at Texas and its interactive website; these asserted contacts do not relate in any known way to the state law claims brought against Magnovo, and Plaintiffs make no effort to argue to the contrary. *See* Pl.'s Br. Opp'n Jackson's & Magnovo's Mot. 17-19 (arguing which forum contacts form a sufficient nexus to Plaintiffs' state law claims, and omitting any reference to Magnovo's internet activities). Likewise, Jackson's contractual relationship with TLI and associated contacts with Texas—on which Plaintiffs heavily rely to establish specific personal jurisdiction over *Jackson*—are not forum contacts for which jurisdiction over *Magnovo* may be asserted. This is because Plaintiffs have not alleged or shown that these contacts on the part of Jackson, which seemingly took place in his capacity as an independent contractor for TLI, occurred while Jackson was acting as an agent of Magnovo or under its direction. *See Daimler AG*, 134 S. Ct. at 759 n.13 ("A corporation can purposefully avail itself of a forum by

---

[12] These claims include unfair competition, trade secret misappropriation, and Texas Theft Liability Act violations.

directing its agents or distributors to take action there.") (citation omitted); *see also* Havel, 2014 WL 4967229, at *15 (noting that "an agency relationship must be affirmatively established[;] it may not be presumed") (citation and internal quotation marks omitted, bracket in original).

That leaves just one set of forum contacts that could potentially confer specific jurisdiction over the state law claims against Magnovo: the three seminars Magnovo contracted and performed in Texas between August 2013 and October 2014. Applying the relatively low burden of proof applicable at this stage, these contacts appear to be sufficiently related to the state law claims at issue, which center on the clients Magnovo purportedly stole from Plaintiffs using, most notably, the customer contact list that Jackson allegedly misappropriated from Plaintiffs. The weight of these contacts, however, is diminished by the weak connection that Plaintiffs trace between the three Texas seminars and the general misconduct alleged. Plaintiff Staneart, to illustrate, merely avers that he "believe[s] the customer" for whom Magnovo conducted one of its three Texas seminars "was Statoil, a long-term repeat customer of TLI," and that he similarly "believe[s]" that Magnovo's other two Texas seminars "were sold to contacts on TLI's customer list." Pls.' App. Opp'n Jackson's & Magnovo's Mot. 6-7 (Ex. A, Staneart Aff. ¶¶ 26, 27). Staneart does not, however, indicate the source of his stated beliefs, which contrast with the version of events told by Defendants—that these seminars were sold to "clients that were not solicited from any client list of [Plaintiffs], but from other contacts who requested [Magnovo's] services."[13] Defs. Jackson's & Magnovo's App. 4 (Ex. A,

---

[13] While the Court must resolve all *factual* disputes in Plaintiffs' favor, it need not accept as true conclusory statements based solely "on information and belief." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (finding that "the district court correctly held that the prima-facie-case requirement does not require the court to credit conclusory allegations," which in this case included allegations "'on information and belief' that Appellee knew Appellants are Texas residents and knew its actions would intentionally cause harm to Appellants in Texas").

APP 115

Jackson Aff. ¶ 7). Moreover, Magnovo shows that its Texas seminars were just three of the seventy-eight total it conducted on a nationwide basis over this period, further diminishing the weight of Magnovo's few relevant contacts. Under these circumstances, the Court finds Magnovo's minimal relevant contacts with this forum insufficient to show purposeful availment for purposes of asserting specific jurisdiction over the state law claims alleged. *See, e.g.*, *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed. App'x 775, 793 (5th Cir. 2007) ("While it is true that a single act can confer personal jurisdiction over a defendant if that act gives rise to the claim being asserted, General Retail has not carried its burden to show that these individuals could reasonably expect to be hailed into court in Texas.") (citing *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)) (internal citation omitted).

Lastly, with respect to the claims for which Plaintiffs have satisfied their burden of establishing Magnovo's minimum contacts, the burden now shifts to Magnovo to show that the exercise of personal jurisdiction over it is unfair or unreasonable. Like Jackson, Magnovo makes virtually no effort to satisfy its burden here. As such, the Court concludes that it may lawfully assert personal jurisdiction over the trademark and anticybersquatting claims against Magnovo. But since Plaintiffs failed to carry their burden with respect to their copyright infringement and state law claims against Magnovo, the Court concludes that exercising personal jurisdiction over these claims would not comport with due process.

### 3.    Defendant Johnston

Next up, the Court considers whether exercising personal jurisdiction over the claims against Defendant Johnston, a Florida resident, accords with due process. As mentioned, only specific personal jurisdiction is at issue. Plaintiffs, therefore, must show that Johnston engaged in purposeful

minimum contacts with Texas, and that those contacts give rise or relate to the state law claims asserted against her. These claims, as a reminder, seek relief for Johnston's alleged trade secret misappropriation, Texas Theft Liability Act violations, unfair competition, breach of contract, and tortious interference with Plaintiffs' prospective business relations. The asserted misconduct underlying each of these claims are allegations that Johnston, upon terminating her agency relationship with TLI, unlawfully used Plaintiffs' trade secrets, including their confidential customer lists, to unfairly compete with Plaintiffs on Defendant Magnovo's behalf.

In arguing that specific jurisdiction over Johnston is constitutional, Plaintiffs primarily rely on Johnston's Texas contacts during her five-year relationship with TLI from August 2008 to July 2013. *See* Pls.' Br. Opp'n Johnston's & Short Splice's Mot. 3-9, 17-19, 20-22. These contacts include (1) the relationship itself; (2) Johnston's two trips to Texas (once for training and another to assist in a TLI workshop); (3) her numerous communications with Texas-based customers; (4) sales resulting from such communications; (5) the multiple event proposals she submitted to TLI for customers in Texas; (6) her various communications with TLI's support personnel in Texas; and (7) the payment requests she submitted to TLI in Texas along with the payments she received from TLI's bank in Texas. *See id.* at 17. Plaintiffs also show that during this five-year relationship (8) Johnston signed and returned to Plaintiffs in Texas a non-disclosure agreement promising not to disclose Plaintiffs' trade secrets, and (9) routinely accessed TLI's customers list and related intellectual property stored on servers located in Texas. *See id.* at 17, 20-21. In addition, Plaintiffs allege that Johnston had at least some contacts with Texas after terminating her five-year agency relationship with TLI in July 2013. These contacts include (10) Johnston's alleged use of Plaintiffs' trade secrets to compete with Plaintiffs in Texas and elsewhere, knowing the effect her unlawful conduct would

have on Plaintiffs in Texas. *See id.* at 19, 21-22. Likewise, Plaintiffs point to (11) demand letters sent to Plaintiffs in Texas following Johnston's departure from TLI by an attorney retained by Johnston "in connection with commissions allegedly owed by TLI to Johnston for past services." *Id.* at 8-9.

Johnston counters that the majority of Plaintiffs' allegations "could be condensed to one simple and undisputed statement—Collette Johnston worked remotely from Florida for five years for Plaintiff TLI, a Texas company with its headquarters in Texas." Defs. Johnston's & Short Splice's Reply 3. But "simply working for a Texas company is not enough," Johnston argues, "to satisfy the exercise of personal jurisdiction against a non-resident." *Id.* Johnston similarly contends that her alleged contacts with Texas over the course of her relationship with TLI, "such as the fact that Johnston communicated with TLI's employees in Texas or received payments from Texas[,] are insufficient to establish specific jurisdiction because they relate only superficially to [her] employment relationship with Texas and not to the basis of the underlying claims." *Id.* at 5. Johnston additionally points out that "nowhere do Plaintiffs allege that any ostensible misuse or misappropriation of [their] information occurred in *Texas*." *Id.* at 6. Applying the holdings reached by other Texas courts faced with similar circumstances, Johnston posits, leads to the conclusion that "Plaintiffs have failed to establish specific jurisdiction." *Id.* The Court, for the reasons that follow, finds Johnston's position here the more persuasive one.[14]

In *Gustafson v. Provider HealthNet Servs., Inc.*, 118 S. W. 3d 479 (Tex. App. 2003), the Texas Court of Appeals found specific jurisdiction lacking over a non-resident defendant—Paul Gustafson—under circumstances similar to those presented here. The plaintiff in

---

[14] The Court reaches this conclusion without addressing Johnston's objections to certain allegations made in Staneart's affidavit. *See* Johnston's & Short Splice's Reply Br. 7.

*Gustafson*—Provider HealthNet Services, Inc. ("PHNS")—had "sued Gustafson for breach of a confidentiality agreement, common law misappropriation, misappropriation of trade secrets, and breach of fiduciary duty," *id.* at 483, all arising out of allegations "that Gustafson had, while employed by PHNS [from his residence in Michigan], provided PHNS's confidential information to [his former Michigan-based employer] as well as a PHNS competitor." *Id.* at 481. In arguing that specific jurisdiction over Gustafson was constitutional, "PHNS relie[d] on Gustafson's contacts with Texas by virtue of his employment with PHNS," including the relationship itself, two employment-related trips he made to Texas, payments he submitted and received from Texas, and communications he had with PHNS employees in Texas. *Id.* at 483.

The Texas Court of Appeals found these contacts insufficient to confer specific jurisdiction over PHNS's claims against Gustafson. In reaching this conclusion, the court noted initially "that the mere fact that Gustafson was employed by a company with its principal place of business in Texas is not sufficient to establish the requisite minimum contacts with Texas." *Id.* (citing *Rittenmeyer v. Grauer*, 104 S.W.3d 725, 733 (Tex. App. 2003); *Burger King*, 471 U.S. at 478, 105 S. Ct. at 2174). The court further explained that Gustafson's alleged contacts with Texas "relate[d] only superficially to his general employment relationship with PHNS," and "were necessarily created" by PHNS's own restructuring of its operations and employment arrangements. *Id.* at 484. The court similarly found Gustafson's two trips to Texas insignificant, reasoning that PHNS had failed to show or allege that Gustafson had "breached any duties to it or committed any torts during these meetings." *Id.* The court additionally rejected PHNS's contention that Gustafson created "'continuing obligations' with Texas" through his employment relationship, because "Gustafson signed no employment agreement" and his confidentiality agreement with PHNS was "executed in Michigan, made no reference to the

State of Texas and did not require any performance in this State." *Id.* Lastly, the court observed that while "a breach of the confidentiality agreement could cause an injury in Texas[,] . . . the mere fact that an injury is caused in the forum state is insufficient to establish minimum contacts." *Id.* (citing *City of Riverview, Michigan v. Am. Factors, Inc.*, 77 S.W.3d 855, 858 (Tex. App. 2002)).

Drawing on *Gustafson*'s reasoning, another case from this District—*Wheel-Source, Inc. v. Gullekson*, No. 3:12-CV-1500-M, 2013 WL 944430 (N.D. Tex. Mar. 12, 2013) (Lynn, J.)—also found specific jurisdiction lacking over a non-resident defendant whose forum contacts and alleged misconduct mirror Johnston's. To illustrate, *Wheel-Source* involved a non-resident defendant who worked for the plaintiff, a Texas-based corporation, as a salesperson for seven years, during which time the defendant worked primarily from his home offices in Michigan, but engaged in various contacts with Texas pursuant to his agency relationship. This relationship ended when the defendant took a position with one of the plaintiff's competitors, after which the plaintiff apparently discovered the defendant's wrongful sharing of confidential information to third parties outside of Texas. The plaintiff, accordingly, filed suit in Texas against the defendant, asserting various claims arising from this alleged misconduct, including, *inter alia*, trade secret misappropriation, tortious interference, and breach of contract.

Addressing the plaintiff's claims in turn, the court in *Wheel-Source* found no specific jurisdiction over the defendant for similar reasons as discussed in *Gustafson*. In regards to its specific jurisdiction over the trade secret claim, the court reasoned that "[a]s was true in *Gustafson*, Defendants contacts with Texas relate only superficially to his general independent contractor relationship," and therefore, are merely "attenuated or fortuitous, as opposed to purposeful." *Id.* at *6. Moving next to the tortious interference claim, the court noted that the plaintiff had not alleged

"any contracts it lost as a result of Defendant's alleged wrongful conduct, all of which appears to have occurred in Michigan." *Id.* Moreover, the court found that the fact that the defendant could foresee that his intentional acts would cause harm to the plaintiff in Texas was not sufficient to establish jurisdiction. *Id.* The court also dismissed the breach of contract claim for lack of personal jurisdiction, finding that the contract at issue was performed "in Michigan, not Texas," and that the breach of contract claim centered on the defendant's "alleged dissemination of confidential information, all of which occurred in Michigan or states other than Texas." *Id.* at *7. In short, the plaintiff's relationship to Texas "rest[ed] on the mere fortuity that Wheel-Source is located in Texas," and therefore, the court concluded that jurisdiction was not appropriate. *Id.* (citing *Moncrief Oil Intern, Inc. v. OAO Gazprom*, 481 F.3d 309, 313 (5th Cir. 2007). This holding accords with a number of other cases from courts in Texas finding the same under similar circumstances.[15]

In this case, the contacts on which Plaintiffs rely in attempting to show specific jurisdiction over Johnston are indistinguishable from those rejected as insufficient in *Gustafson*, *Wheel-Source*, and related Texas cases. Like in those cases, nearly all of Johnston's forum contacts over the course of her agency relationship with Plaintiffs bear only a superficial relation to the misconduct alleged. Plaintiffs have not asserted, for example, that Johnston's numerous communications with TLI personnel and customers, her sales proposals for Texas customers, or her payments from Texas gave rise or relate to the misappropriation at issue. Likewise, Johnston's two trips to Texas, much like

---

[15] *See, e.g.*, *360 Mortgage Grp., LLC v. Stonegate Mortgage Corp.*, No. A-13-CA-942-SS, 2014 WL 2092496, at *3-4 (W.D. Tex. May 19, 2014) (no specific jurisdiction over trade secret claims brought against an individual "who worked exclusively in North Carolina," but had a number of contacts in Texas pursuant to his employment with the plaintiff, a company headquartered in Texas); *Rushmore Inv. Advisors, Inc. v. Frey*, 231 S.W.3d 524, 529-30 (Tex. App. 2007) (no specific jurisdiction over trade secret misappropriation, unfair competition, and breach of contract claims against non-resident defendant based on defendant's insufficient forum contacts during a "twenty-two month course of employment with a Texas firm").

those taken by the defendants in *Gustafson* and *Wheel-Source*, were merely work related and have nothing to do with the underlying suit. Additionally, Johnston's post-employment demand letters sent to Plaintiffs in Texas concern a dispute over unpaid commissions allegedly owed to Johnston, which is unrelated to Johnston's purported use of Plaintiffs' confidential information in this case.

Similarly, Plaintiffs also fail to demonstrate an adequate connection between Johnston's alleged misconduct and this forum. Plaintiffs do not show, for instance, that Johnston's alleged misuse of their trade secrets took place in Texas, or that she helped secure new customers or business for Magnovo in Texas, or that her conduct in any way had an effect on Texas residents outside of Plaintiffs themselves. These in-state effects on Plaintiffs, moreover, are not sufficient on their own to establish jurisdiction over Johnston, just as they weren't sufficient in *Wheel-Source* or *Gustafson*.[16] And while Plaintiffs say that Johnston "likely contacts Texas residents in an effort to make sales on behalf of Magnovo," they base this assertion solely on Magnovo's activities—the fact that it "targets Texas residents through its Texas directed webpages." Pls.' App. Opp'n Johnston's & Short Splice's Mot. 8 (Ex. A, Staneart Aff. ¶ 38). Such unilateral activities on the part of another party cannot be used to confer jurisdiction over Johnston. *See Walden*, 134 S. Ct. at 1122.

Plaintiffs' reliance on Johnston's long-term agency relationship with TLI does not salvage their inadequate showing of relevant contacts purposefully directed at Texas. Unlike Defendant Jackson or the non-resident defendant in *Burger King*, Johnston's forum contacts over the course of her relationship with TLI arose, not from Johnston's purposeful efforts to secure work from TLI in

---

[16] *See also Walden*, 134 S. Ct. at 1123 (clarifying that under the effects test established by *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed. 2d 804 (1984) the Supreme Court "examined the various contacts the defendants had created with California (and not just with the plaintiff)").

Texas, but from TLI's unilateral decision to internally restructure and directly hire its former subcontractors, including Johnston. Johnston, moreover, never signed an employment or independent contractor agreement governing her relationship with TLI, which she performed almost exclusively from Florida. Though at one point during her five year agency relationship, Johnston did sign a non-disclosure agreement with TLI before receiving TLI's 2013 corporate handbook, this discrete agreement—like those in *Gustafson* and *Wheel-Source*—was executed by Johnston in Florida, made no mention of Texas, and required no performance in Texas. Thus, like in those cases, the mere fortuity that Johnston had an employment relationship with TLI, a Texas company, and engaged in mostly remote contacts with Texas from her home in Florida pursuant to this relationship, is not enough for the Court to lawfully assert jurisdiction over Johnston here in Texas.

In the end, Plaintiffs fail to show that the connection between Johnston, Texas, and this litigation extends beyond the mere fortuity that Plaintiffs happen to reside here. *See Walden*, 134 S. Ct. at 1122 ("[T]he plaintiff cannot be the only link between the defendant and the forum [for personal jurisdiction to exist]"). Because of this, the Court concludes that Plaintiffs have failed to present a *prima facie* case of personal jurisdiction over Johnston, and therefore, that dismissal of the claims asserted against her under Rule 12(b)(2) is warranted.

### 4.    Defendant Short Splice

Having found personal jurisdiction over Johnston lacking, the Court can quickly dispose of the jurisdictional arguments made in regards to Short Splice. Plaintiffs' primary contention here is that "the aforementioned actions of Johnston during the period of January 1, 2011 through July 2013, are directly attributable to Short Splice," and therefore, "Short Splice's contacts with Texas were sufficient to support the Court's exercise of personal jurisdiction in this case." Pls.' Br. Opp'n

Johnston's & Short Splice's Mot. 20. But even assuming that all of Johnston's contacts during this time period may be imputed to Short Splice, Plaintiffs' efforts to show personal jurisdiction over Short Splice would still fall short, given the Court's above conclusion that Johnston's contacts are insufficient to establish personal jurisdiction over the same claims against her. Accordingly, the Court determines that Plaintiffs have also failed to present a *prima facie* case of personal jurisdiction over Short Splice, and that dismissal of the claims against Short Splice is, therefore, warranted under Rule 12(b)(2).

## III.

### TRANSFER OF VENUE

Having determined that it may lawfully assert jurisdiction over at least some of Plaintiffs' claims against Defendants Jackson and Magnovo, the Court turns next to Jackson's and Magnovo's request, in the alternative, for a transfer of venues to the judicial district in which they reside: the Southern District of Indiana. Defendants argue that such a transfer is warranted under 28 U.S.C. § 1404(a), which codifies "the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 580, 187 L. Ed. 2d 487 (2013). This doctrine, and thus the § 1404(a) analysis, requires courts to balance a number of judicially-developed factors, including:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious and inexpensive; (5) the administrative difficulties flowing from court congestion; (6) the local interest in having localized interests decided at home; (7) the familiarity of the forum with the law that will govern the case; and (8) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law.

*In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013) (quoting *In re Volkswagen of Am., Inc.*, 545

F.3d 304, 311 (5th Cir. 2008) (en banc)) (quotation marks and brackets omitted).

Importantly, courts must weigh these factors in a way that "reflect[s] the appropriate deference to which the plaintiff's choice of venue is entitled." *Volkswagen*, 545 F.3d at 315. The party seeking a transfer, thus, bears the burden of establishing "'that the transferee venue is clearly more convenient'" when judged in light of the above factors. *Radmax*, 720 F.3d at 288 (quoting *Volkswagen*, 545 F.3d at 315).

Here, Jackson and Magnovo have not satisfied the heavy burden they must carry to show that the Southern District of Indiana is a clearly more convenient venue than this District—the venue in which Plaintiffs chose to file suit and labored to establish personal jurisdiction. Of the few points raised by Defendants here, nearly all are typical of the circumstances faced by out of state litigants. For example, Defendants assert that "the majority of [their] evidence is located in Indiana, as well as several of [their] witnesses," and "the fact that Indiana is the place of residence of Jackson and the principal place of business of Magnovo makes trial of this case easier, more expeditious, and less inexpensive (sic)." Defs. Jackson's & Magnovo's Mot. 21-22. This, of course, is offset by the fact that Plaintiffs' witnesses and evidence are primarily in Texas, and that it would be easier and less expensive for them to try this case at home in Texas. Defendants also argue that Plaintiffs' request for injunctive relief makes it "more appropriate for an Indiana court to determine and regulate the future activities of [Defendants] located in Indiana." *Id.* at 22. They offer no explanation, however, as to why a federal court in Indiana would be more adept at deciding the issues in this case than a federal court in Texas, and they even admit that the injunction requested "would apply on a national level, not merely in Texas" or Indiana. *Id.* Lastly, Defendants point out that "litigation is already pending in the United States District Court, Southern District of Indiana, between the parties." *Id.*

But aside from asserting in conclusory fashion that both cases "involv[e] a substantial number of the same basic facts, witnesses, and parties," *id.*, Defendants do not explain why it would be any more efficient to send this seemingly separate case to Indiana for adjudication, simply because the parties are engaged in another legal dispute in that forum.

Ultimately, the record suggests that the Southern District of Indiana stands on equal footing with this venue in terms of convenience and fairness to the parties. In such circumstances, the Court must defer to Plaintiffs' choice of forum in filing suit in this venue. *See Volkswagen*, 545 F.3d at 315. Therefore, the Court concludes that Jackson and Magnovo are not entitled to the relief sought in their motion to transfer pursuant to 28 U.S.C. § 1404(a).

## IV.

### CONCLUSION

For the foregoing reasons, the Court concludes that it may assert personal jurisdiction over the trademark and anticybersquatting claims brought against Defendants Jackson and Magnovo, and the state law claims against Defendant Jackson. For these claims, the Court further determines that Defendants Jackson and Magnovo have not shown that a transfer of venues pursuant to 28 U.S.C. § 1404(a) is warranted. For all other claims against Defendants Jackson and Magnovo, Plaintiffs have failed to make out a *prima facie* case of personal jurisdiction. Likewise, the Court finds that Plaintiffs have failed to make out a *prima facie* case of personal jurisdiction with respect to any of their claims against Defendants Johnston and Short Splice.

Accordingly, the Court **GRANTS IN PART** Defendants Jackson's and Magnovo's Motion to Dismiss (doc.39), and hereby **DISMISSES WITHOUT PREJUDICE TO REFILE IN ANOTHER FORUM FOR LACK OF PERSONAL JURISDICTION** Plaintiffs' claim against

Defendant Jackson for Federal Copyright Infringement (Am. Compl. ¶¶ 166-75), as well as Plaintiffs' claims against Defendant Magnovo for Federal Copyright Infringement (*id.* ¶¶ 166-75), Unfair Competition by Misappropriation (*id.* ¶¶ 176-83), Texas Theft Liability Act (*id.* ¶¶ 184-86), and Conversion and Misappropriation of Trade Secrets (*id.* ¶¶ 187-99). The Court **DENIES IN PART** Defendants Jackson's and Magnovo's Motion (doc. 39) in all other respects.

The Court also **GRANTS** Defendants Johnston's and Short Splice's Motion to Dismiss (doc. 41), and hereby **DISMISSES WITHOUT PREJUDICE TO REFILE IN ANOTHER FORUM FOR LACK OF PERSONAL JURISDICTION** all of Plaintiffs' claims against Defendants Johnston and Short Splice.

SO ORDERED.

Dated: July 24, 2015.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-43-

APP 127