# EXHIBIT 16

DOUG STANEART

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE LEADER'S INSTITUTE, LLC )
and DOUG STANEART, )
)
Plaintiffs and )
Counter-Defendants, )
)
VS. ) Case No. 3:14-cv-03572-B
)
ROBERT JACKSON and MAGNOVO )
TRAINING GROUP, LLC, )
)
Defendants and )
Counter-Plaintiffs. )

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
THE LEADER'S INSTITUTE
BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
DOUG STANEART
JULY 7, 2016
VOLUME 1
CONTAINS ATTORNEYS' EYES ONLY PORTIONS
(PAGES 24-29 & 93-124)

---------------------------------------------

JOB NO. 109903

DOUG STANEART

ORAL AND VIDEOTAPED DEPOSITION of THE LEADER'S INSTITUTE, by and through its designated representative DOUG STANEART, a witness produced at the instance of the Defendants and Counter-Plaintiffs, taken in the above-styled and numbered cause on the 7th day of July, 2016, from 9:22 a.m. to 4:43 p.m., before Stacy L. Jordan, a CSR in and for the State of Texas, Registered Professional Reporter and Certified Realtime Reporter, taken in the offices of Klemchuk, LLP, 8150 North Central Expressway, 10th Floor, Dallas, Texas 75206, in accordance with the Federal Rules of Civil Procedure.

DOUG STANEART

three, four, five, six, seven, eight, nine -- 10 things to do with your graduates after they finish that will help you collect -- get more repeat business from them on the coach -- doing coaching sessions with them and showing them how to go and meet with them one-on-one. It shows -- tells them how to do a coaching session with them and gives six, seven, eight different steps there.

There's a whole section here on how to prospect for new classes, so how to get a corporate class from -- from an individual that's attending one of your classes. There's one, two, three, four, five, six, seven, eight, nine, 10, 11, 12, 13, 14, 15, 16, 17 -- 17 things that you can do with each individual person that's in a class to -- to do it. That's just for Fearless Presentations.

There's also a whole section in here on looking for a niche group, so basically, how to -- how to take the people that are in your group, find something that's a niche and then become the expert in that. It tells how to do face-to-face meetings with -- with clients, and there's one, two, three, four, five, six, seven, eight, nine, 10 -- 10 different things that you can do in a face-to-face meeting to help get repeat business.

Q. Okay.

A. So...

Q. You've explained --

A. And then there's the team-building side, as well.

Q. Sure. And -- and you've explained what the step-by-step -- and I guess I'll read about it in the -- when I have a chance to look at the corporate handbook.

Well, what evidence do you have -- I know you have a belief or a suspicion that they're using it. What evidence do you have that they are using it?

A. Well, up until the -- the -- the -- up until the last few minutes, I haven't been able to look at any documents that -- that they've sent to us, so I can't answer that question. I have a -- I have a strong belief based on circumstantial evidence. I don't know what evidence has been collected at this point.

Q. Okay. Well, you filed the lawsuit on -- in state court -- I believe it was in September of 2013. Does that sound right -- about right?

A. Right.

Q. Cynthia Cook was your attorney at the time?

A. Correct.

Q. Lead counsel. I think she's on the pleadings

in this case, as well.

And in that lawsuit, you alleged theft of the TLI corporate handbook. Do you recall that?

A. That I alleged what of the TLI corporate handbook?

Q. That --

A. I didn't hear the --

Q. That my clients --

A. -- the whole question.

Q. -- had stolen or -- or had misappropriated your corporate handbook. Correct?

A. Correct, yes.

Q. And at that time, they were not a million-dollar company, were they? They'd just started.

A. No, they were not.

Q. Okay. So what circumstantial evidence did you have at that time that somehow they were using your corporate handbook?

A. They --

MR. SORDEN: Before you answer the question, I want to make sure there's no waiver.

I don't want you to disclose any attorney-client communications or work product --

MR. MARCONI: That's fine.

DOUG STANEART

MR. SORDEN: -- between you and Ms. Cook or any of the associates of -- of --

MR. MARCONI: That's --

MR. SORDEN: -- Ms. Cook at the time.

MR. MARCONI: That's fine.

MR. SORDEN: You're free to answer otherwise regarding the facts and circumstances --

THE WITNESS: I don't think I have to --

MR. SORDEN: -- around your allegations.

A. The -- Colette Johnston was sent the TLI corporate handbook about three or four months prior to her resigning, and she never returned it. We asked her to return it, and she didn't. She refused. In fact, she -- she request- -- she requested that we -- that we do all communications with her attorney. And we requested of her -- her attorney, and the attorney refused to return the -- the TLI corporate handbook, and so we filed the lawsuit for that, so...

Q. (BY MR. MARCONI) Well, it's funny -- and maybe you can -- you can help me out with this, but I've -- I've looked for -- for something as -- as -- that you consider to be as critical a trade secret as the corporate handbook, I would have thought that I would have seen e-mails to her or letters to her counsel

DOUG STANEART

A. -- ever said -- ever --

Q. That you guys are --

A. -- sent us --

Q. -- the problem.

A. Yeah, actually, the -- at one time, the Build-A-Bear company, the -- the -- the folks who make the bears at the -- at the mall, they sent a -- they sent a cease-and-desist letter to us. And I responded with my federal trademark registration, and -- and they never pursued, so...

Q. And they were complaining about Build-A-Bear or Build- --

A. Build-A-Bike.

Q. -- A-Bike? Build- --

A. Yeah, they said that Build- -- they said that Build-A-Bike was their trade address -- or the -- the "A," dash, with the dashes, was their trade address, so -- but once I sent them our registration, I never heard from them again. As far as I know, that's the only company that's ever said that they were the owners of "Build-A-Bike."

Q. All right. Number 21, it asks for all actions taken by plaintiffs or anyone acting on your behalf to stop/attempt to stop any and all third parties from

using the phrase "Build-A-Bike" and/or "BUILD-A-BIKE" at any time in which TLI has been an active operation.

Well, we have this lawsuit, so that's one action taken by plaintiffs. Any other actions taken by plaintiffs other than cease-and-desist letters, to which you've already testified?

A. Yeah, the -- the only thing that -- the only instance that somebody has refused to comply with the cease-and-desist was a company called TeamBonding.

Q. Okay.

A. And that's a -- that suit is -- that suit -- I'm --

MR. SORDEN: I'm going to caution you not to -- to disclose any attorney-client or work-product privilege. But to the extent you can testify to facts surrounding that lawsuit, you're free to say the same.

THE WITNESS: Can we go off record for a just second?

MR. MARCONI: Sure.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off record at 2:34 p.m.

(Recess taken from 2:34 to 2:35 p.m.)

THE VIDEOGRAPHER: We're back on record

at 2:35 p.m.

MR. SORDEN: Counsel, my client sought a -- a ruling on whether -- whether he wanted to say attorney-client privilege or work-product privilege. I instructed him what his answer would be -- what -- you know, what would be privileged and what would not be privileged, and at this point in time, you can reask the question and he can answer it.

MR. MARCONI: Well, the -- I can't remember what the last question was, but let me see if I can --

A. I can give you the answer.

MR. SORDEN: I believe it was the --

Q. (BY MR. MARCONI) Sure.

MR. SORDEN: -- outcome of the TeamBonding --

Q. (BY MR. MARCONI) I guess the status of the TeamBonding lawsuit --

A. Yeah, it's my understanding that there has -- that we've come to a settlement in that case.

Q. Has the settlement been reduced to writing?

A. It's in -- it's in the process of --

MR. SORDEN: No waiver?

MR. MARCONI: No waiver.

DOUG STANEART

MR. SORDEN: You can answer the question.

A. It's -- it's in the process of -- at this point, yes.

MR. SORDEN: And, Counsel, I'll just let you know, once that is reduced to writing and finalized, I'll produce it in this case.

MR. MARCONI: Okay.

A. Both -- both parties have agreed to the settlement.

Q. (BY MR. MARCONI) All right. So really, what you're doing right now is just papering the settlement?

A. Correct.

Q. But there's no real dispute about what the terms of the settlement are?

A. No.

MR. SORDEN: No waiver.

Q. (BY MR. MARCONI) Do you know what the terms of the settlement are?

MR. SORDEN: I'm -- Counsel, I'm a little bit worried about whether it's confidential. Our law firm is not handling the lawsuit, so I don't know what is and what isn't confidential at this point in time regarding those two parties; however, I will -- I will let him answer this question for you --

MR. MARCONI: Let -- let me ask you -- let me ask you this: When do you anticipate that the settlement is going to be finalized? I know your firm is not handling it, but --

MR. SORDEN: My understanding is within the next week or two. However, I could work with the clients to speed that process up if -- if the status is -- it seems like to me to be papered up can be pretty -- pretty quickly.

MR. MARCONI: All right. And I --

MR. SORDEN: Secondly, I'll also confirm whether, in fact, it is confidential. At this point in time, it may not be, but I haven't seen it. Just out of an abundance of caution, I want to make -- make a record of it.

Q. (BY MR. MARCONI) I'm trying to streamline this a bit. Look at Number 41, if you would, sir, Topic Number 41. And you might as well look at 42 at the -- at the same time.

MR. SORDEN: And, Counsel, I believe he has in the stack of his documents some -- a document or two that's responsive to 41 and 42.

MR. MARCONI: Okay.

Q. (BY MR. MARCONI) Can you show me those

THE WITNESS: Right. I'm --

A. You know, pre- -- in preparing for -- for testimony today, I would have acc- -- probably accessed it very recently.

Q. (BY MR. MARCONI) Okay. Number 16 is: The factual bases for plaintiffs' claim that Jackson and/or Magnovo allegedly infringed upon plaintiffs' trademarks for BUILD-A-BIKE, Build-A-Bike and/or other substantially similar phrases.

When did you send a cease-and-desist letter -- remind me again. What was the date that a cease-and-desist letter was sent on behalf of TLI?

A. I believe that was mid-2014 sometime.

Q. And who sent that? Do you recall what law firm sent that?

A. I believe that was Kristin Harkins.

Q. At Conley Rose?

A. Conley Rose, yes.

Q. Okay. And I can't recall. I should know this, since I was counsel of record in the -- in the Texas lawsuit that Cynthia Cook filed. Was -- was trademark -- trademark infringement was not part of that lawsuit?

A. It was not because --

Q. Okay.

A. -- at the time that -- sorry.

Q. I -- I just want to make sure.

A. Yeah, it -- yeah, at the time that we filed the lawsuit, I don't believe there were any trademark infringements.

Q. Okay. So when is it that -- when is it that you determined or someone determined for you that Jackson and Magnovo were allegedly infringing your trademarks?

MR. SORDEN: No waiver.

You may answer this question. I just don't want you to disclose any kind of attorney-client communications.

THE WITNESS: I'm not.

A. I first came across the -- the term "build a bike" in a -- in kind of a descriptive way on his Web site fairly early on. I would say late 2013.

Q. (BY MR. MARCONI) Okay.

A. The -- the -- when -- the big one, though, was the Web site "Let's Build a Bike" that popped up. He purchased a Web site in -- we now know that it was in late 2013. And he populated that with over 200 instances of the "build a bike" trade name -- or name on

that in different places. It's a small Web site, so it was -- I mean, it was highly populated with the words.

What happened was it started popping up in the Google search engine rankings, and it started popping up above mine. So basically, we had The Leader's Institute and my Build-A-Bike Web sites, which have always come up, you know, one, two or one, two, three, something like that, you know, something very high. And now all of a sudden, this "Let's Build a Bike" kind of popped up. I didn't know Jackson owned it. But we -- when I did the research to -- to send out a cease-and-desist, I found out that Jackson was the owner of that. And when I did, that's when we made a -- we changed the -- we add the -- I think it was the second amended complaint, to add the Let's Build a Bike to the -- to the Texas district court case.

Eventually, we found -- what -- when it -- sorry.

Q. (BY MR. MARCONI) Let me stop you there, just to make sure that I've got your sequence of events correct. Did -- because there was an amended petition that was filed in the state district court case. And again, my memory is fuzzy on that case because not -- not a whole lot happened in it.

Are you saying that in the amended petition in the state court case that you did add trademark claims?

A. We did, yes, in the amend- --

Q. Okay.

A. Yes.

Q. I just didn't recall.

A. Yeah. In -- in March, though, that's when things really came to -- that's also when I reported them -- reported Magnovo and Rob to the FBI, was -- in -- in March, all of a sudden, I got a notification from Google that my Web site, The Leader's Institute, had been banned from Google. It was what's called a "manual penalty," which is -- it's like the death penalty for a Web site. It's one of those things that is very, very challenging. And -- and I had no idea why. So --

Q. And this -- this was March of 2014, to be clear?

A. March of 2014, yes.

Q. Okay.

A. Did I say something -- did I say that differently? So --

Q. No. Let me ask you this. I think you

testified -- and I want to make sure I've got my sequence of events. I do recall seeing a -- a cease-and-desist letter in -- I want to say it was from Conley Rose in September or so of 2014. But you believe that there was an earlier one sent than that, or was that the -- or are we talking about the same letter?

A. No, we just -- we -- we didn't send a cease-and-desist letter. We -- we actually just added it to the amended complaint because at the time that we filed the original complaint, we weren't aware of any trademark infringements, and --

Q. Okay.

A. -- there may not have been any. But by the time we filed the second complaint, there were -- I'm talking thousands of --

Q. Okay.

A. -- different trademark infringements.

Q. So then you -- you dismissed -- you nonsuited the petition in the Texas case in -- was it March of 2014? Do you recall what date it was?

A. I -- I wouldn't argue with that. I -- I think that sounds reasonable --

Q. Okay.

A. -- anyway.

Q. And -- and I believe I've seen some testimony from you in another -- maybe in a related matter -- that you did that ostensibly because the FBI told you that they could not continue their investigation of Jackson or Magnovo as long as there was a civil lawsuit --

A. It was -- it was secondhand. The FBI agent that was -- that had taken the information from me, she said that -- that's what she told me. So --

Q. Okay.

A. -- we -- we -- I -- once the trademark stuff kind of came in, I kind -- the -- the district court didn't seem like the proper place, anyway. So it was reasonable to dismiss in district and go to -- to federal court, anyway. And it also gave the FBI a chance to investigate.

Q. Okay. We're -- we're going to skip the FBI for -- for today, I think.

MR. MARCONI: Aren't we?

MR. VAUGHT: Yeah.

Q. (BY MR. MARCONI) But -- all right. So we roll along to -- and I think in September a cease-and-desist letter was sent to -- by Conley Rose. I think you mentioned the lawyer's name. Does -- after that letter, did they take down -- did they cease to

folks other than somebody at Magnovo wouldn't have, like Magnovo pictures and stuff like that, that they wouldn't have, so -- unless somebody is --

Q. And have you produced documents that show all of that?

A. I did. That's what we ref- -- that's what I referenced a few minutes ago that Mr. Vaught said he wanted to --

MR. VAUGHT: He'll give us the Bates labels.

A. The --

MR. MARCONI: Okay.

MR. SORDEN: Yeah, it's a big range.

MR. MARCONI: I think I -- was this what was produced yesterday or --

MR. SORDEN: And to the DOJ about three weeks ago.

MR. MARCONI: Okay.

Q. (BY MR. MARCONI) Okay. We've talked about this -- and I'm not going to go into it -- this Lisa Smith persona that you created. Have you ever done that? Have you created any other fake persons?

A. No.

Q. That's the only one you've ever created? Yes

or no?

A. I -- I -- I -- I don't create -- I don't create fake persons, no.

Q. Well, I mean, Lisa Smith was a fictitious person, wasn't she?

A. Correct, yes.

Q. Okay. Look at Number 48, if you would. I guess the question is -- is: What mirror -- mirroring, framing, masking and forwarding with masking of Magnovo's or Jackson's Web sites by TLI -- I mean, did TLI or Staneart do?

A. I -- I don't really recall the details, but it -- there -- there were some Web sites that I bought that I forwarded over to one of Rob Jackson's Magnovo Web sites.

Q. Okay. Let me make sure I understand it. These are Web sites that you purchased --

A. Correct.

Q. -- that -- what do these Web sites say? I mean, what --

A. Nothing. They said nothing. They were just --

Q. And you forwarded them over to Rob Jackson's Web sites?

A. Yeah. I think it was the bicycle team-building events, if I recall, Web site.

Q. Why would you do that?

A. I don't remember. I don't recall. I was upset at --

Q. But what was --

A. -- Jackson, so...

Q. -- the -- I mean, what was the -- what -- what would it achieve, in your mind? I understand you were upset, but what would --

A. I -- I don't think it achieves anything. There's really -- I don't know if there's -- I don't think there's any achievement for it. I don't -- I don't think there's any reason to do it or not do it, so...

Q. Well, regardless of whether there's a reason, I'm not saying -- asking you whether you think it was a good idea or a bad idea or put you on a guilt trip. I'm just trying to figure out -- at some point in time, you obviously made a conscious decision to do that. You'd agree --

A. Yes, sir.

Q. -- with that, wouldn't you, sir?

A. Yes, sir.

DOUG STANEART

Q. And obviously, you felt that by doing that you would either harass or harm Jackson or Magnovo, for whatever reason. How would they be harmed or harassed by -- by that?

MR. SORDEN: Objection, calls for a legal conclusion.

A. I don't --

MR. SORDEN: You can answer the question.

A. I don't know how they would be harmed by that.

Q. (BY MR. MARCONI) Okay. And presumably, you stopped doing that?

A. I did.

Q. Okay. Incidentally, you also filed for a trademark application, didn't you, on behalf of yourself for the "Magnovo" name?

A. I did.

Q. And why did you do that?

A. Well, because at the time that I did that, I had just been through days and days of depositions with Rob Jackson and -- and Colette Johnston, and Rob basically perjured himself under oath. He basically said that he wasn't doing any business with -- with Magnovo; he had done nothing with Magnovo during the entire time that he was working for The Leader's

DOUG STANEART

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed of any attorney or counsel employed by the parties hereto, or financially interested in the action.

CERTIFIED TO BY ME on this the 13th day of July, A.D., 2016.

____________________________________

Stacy L. Jordan, CSR, RPR, CRR, CLR
Texas CSR 7499
Expiration date: 12/31/2016
TSG REPORTING, INC.
747 Third Avenue
New York, New York 10017
Tel. No. 877/702-9580