UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE LEADER'S INSTITUTE, LLC, and DOUG STANEART, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:14-CV-3572-B |
| ROBERT JACKSON, and MAGNOVO TRAINING GROUP, LLC, | § § § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

This intellectual-property dispute arises between competitors in the team-building industry. Defendant Robert Jackson worked for Plaintiff The Leadership Institute (TLI), but now he works for Defendant Magnovo Training Group (Magnovo). Jackson's departure from TLI triggered this controversy because TLI and its owner, Plaintiff Doug Staneart, believe Jackson absconded with vital trade secrets and that Jackson and Magnovo are using TLI's federally registered trademarks. Jackson and Magnovo respond that Staneart and TLI have abused the legal process, defamed Jackson, and infringed Magnovo's federally registered copyrights, and they ask the Court to cancel TLI's trademarks. Robert Jackson[1] seeks partial summary judgment on the plaintiffs' claims against him, and the plaintiffs seek partial summary judgment on the defendants' equitable defenses and counterclaims. The Court **DENIES** Jackson's motion for partial summary judgment (Doc. 180) and **GRANTS** in part and **DENIES** in part the plaintiffs' motion for partial summary judgment (Doc.

---

[1] Magnovo has not moved for summary judgment on any of the plaintiffs' claims against it.

177).

# I.

# BACKGROUND[2]

A.   *Factual Background*

Doug Staneart created TLI, which, since 2002, has been in the business of organizing corporate charity events and conducting corporate-leadership, team-building, and public-speaking seminars. Doc. 30, Fourth Am. Compl., ¶¶ 29–30. For example, TLI conducts build-a-bike events—to which businesses pay to send their employees for the opportunity to work together to build bicycles that are donated to charity. *Id.* at ¶¶ 30–32. The experience simultaneously promotes team work and charitable giving. *Id.* at ¶ 31.

Staneart registered "Build-A-Bike" and "BUILD-A-BIKE" as service marks[3] with the United States Patent and Trademark Office (USPTO) and subsequently assigned the build-a-bike marks to TLI. *Id.* at ¶¶ 32–34. The USPTO put the marks on the Supplemental Register[4] on November 18, 2008, Doc. 179-2, App'x to Pls.' Mot. Partial Summ. J., Ex. 1, 47, and on the Principal Register[5] on June 3, 2014. *Id.* at 49. The plaintiffs have attempted to protect their trademark rights by sending cease-and-desist letters, Doc. 179-12, App'x to Pls.' Mot. Partial Summ. J., Ex. 11, 226, 271; Doc.

---

[2] This factual history is drawn from the plaintiffs' Fourth Amended Complaint, the defendants' First Amended Answer and Counterclaims, and the parties' briefing on the pending motions for summary judgment. The Court has noted when facts are in dispute.

[3] The Court will refer to TLI's registered marks as the "build-a-bike marks."

[4] The "supplemental register" contains marks "capable of distinguishing applicant's goods or services and not registrable on the principal register." 15 U.S.C. § 1091(a).

[5] The "principal register" contains marks that have actually become distinctive. 15 U.S.C. § 1052(f). A mark is distinctive if consumers associate it with a particular source. 1 Trademark Registration Prac. § 7:9.

30, Fourth Am. Compl., ¶ 89, and by recovering internet domain names resembling the build-a-bike marks, Doc. 179-10, App'x to Pls.' Mot. Partial Summ. J., Ex. 9. TLI also filed a lawsuit alleging trademark infringement against a company TLI thought was using the build-a-bike marks. Doc. 186-23, App'x to Defs.' Summ. J. Resp., Ex. W.

The plaintiffs claim also to have spent substantial time, labor, and money in the development of trade secrets—namely, customer lists. Doc. 30, Fourth Am. Compl., ¶¶ 39–41. On TLI's customer lists are over 400 Fortune 500 companies and contacts at those companies the plaintiffs say are "extremely difficult and costly to identify." *Id.* at ¶¶ 42–43. TLI keeps its customer lists secret by storing them on a password-protected internal system. *Id.* at ¶ 46. Only employees with a specific need can access TLI's customer list, and TLI's employees and independent contractors agree to non-compete clauses prohibiting them from using TLI's customer lists within fifteen months after they leave TLI. *Id.* at ¶¶ 47–48.

Robert Jackson began to teach seminars for TLI in December 2006 as an independent contractor. Doc. 30, Fourth Am. Compl., ¶ 52. Between then and January 2009, Jackson conducted public-speaking seminars for TLI and became TLI's Vice President of Instruction. *Id.* But in January 2009, TLI terminated its relationship with Jackson because it believed Jackson was operating a company called Magnovo[6] in direct competition with TLI. *Id.* at ¶ 54. Jackson nonetheless returned in September, October, and November 2010, asking to rejoin TLI as an independent contractor. *Id.* at ¶¶ 55–57. In November 2010, Staneart offered Jackson the opportunity to conduct a TLI seminar. *Id.* at ¶ 57. Jackson agreed to become an independent contractor, and the plaintiffs allege that he

---

[6] This entity is the predecessor to Defendant Magnovo.

signed an independent-contractor agreement that stated

> Any client list developed through advertising or marketing from TLI, the course materials and instructional techniques used, and the goodwill generated by this client list and instruction materials and techniques are the intellectual property of TLI. So by approving to the terms of this agreement, you also agree not to use the client list developed by you while working as an agent of TLI, or client lists developed by other TLI instructors, to compete with TLI for a period of 18 months after the termination of this agreement.

*Id.* at ¶¶ 58–60. Jackson claims he never signed this agreement. Doc. 180, Robert Jackson's Mot. Partial Summ. J., ¶ 5.[7]

The plaintiffs allege that Jackson wronged them in various ways after he signed the agreement but before[8] he left TLI in August 2013—a time period during which Jackson could access TLI's customer lists. Doc. 188-5, App'x to Pls.' Summ. J. Resp., Ex. D, 33–34. While under agreement with TLI, Jackson solicited TLI's customers for business and invoiced them for seminars he would teach in August 2013 after leaving TLI. Doc. 188-6, App'x to Pls.' Summ. J. Resp., Ex. E, 56, 66–69, 82, 88, 90, 92. According to TLI, Jackson even emailed Colette Martin, who also left TLI for Magnovo, a compilation of TLI's customer-contact information. Doc. 188-2, App'x to Pls.' Summ. J. Resp., Ex. A.

Jackson denies the plaintiffs' allegations. He says he never copied, downloaded, or used TLI's customer or pricing information to compete with TLI while under agreement with TLI. Doc. 151,

---

[7] Jackson has not raised the absence of a contract as a ground for summary judgment on the plaintiffs' contract claim. *See* Doc. 180, Robert Jackson's Mot. Partial Summ. J., ¶¶ 32–33 (discussing only the breach element of the plaintiffs' contract claim). Whether Jackson signed the contract is thus irrelevant.

[8] The plaintiffs also complain about conduct that occurred after Jackson left TLI, but these claims are not at issue in the parties' current motions.

App'x to Robert Jackson's Mot. Partial Summ. J., 2. Rather, Jackson says Magnovo developed websites and invested in search-engine optimization to gain clients. *Id.* at 4. Regarding Novartis and Royal Caribbean, Jackson admits to agreeing to do presentations for them while he was still under agreement with TLI but says the companies came to him; he claims not to have actively sought speaking engagements with them while he was with TLI. *Id.* at 2–4. Jackson claims also that his friend Bert Von Mitendorf introduced him to Larry Pimental, who worked for cruise lines including Royal Caribbean, and that Pimental asked Jackson to provide workshops to the cruise lines. *Id.* Jackson also complains that statements Staneart made to others, including Colette Martin, regarding Jackson's alleged use of TLI's trade secrets defamed him. Doc. 186-1, App'x to Robert Jackson's Mot. Partial Summ. J., 3–4.

Magnovo also claims to have some intellectual property of its own and says the plaintiffs have infringed it. Doc. 131, Defs.' First Am. Answer, Defenses, & Countercls., ¶¶ 268–75. Magnovo has registered copyrights pertaining to the Bicycle-Team-Building-Events.com website and "Magnovo Photo 1." Doc. 186-24, App'x to Defs.' Summ. J. Resp., Ex. X, 254. The defendants allege that the plaintiffs have caused TLI's websites to "frame" Magnovo's Bicycle-Team-Building-Events.com website, which means the plaintiffs caused Magnovo's website to appear within and under the plaintiffs' registered domain names. *Id.* at 255. The defendants accuse the plaintiffs also of fraudulently applying to register "Magnovo" as a trademark. Doc. 186-16, App'x to Defs.' Summ. J. Resp., Ex. P., 115–16. But after the defendants challenged the plaintiffs' application, the plaintiffs withdrew it. Doc. 186-4, App'x to Defs.' Summ. J. Resp., Ex. D., 59–60.

B.    *Procedural History*

In September 2013, the plaintiffs sued the defendants in Texas state court. Doc. 179-16, App'x to Pls.' Mot. Partial Summ. J., Ex. 16, 323–24. But in May 2014, the plaintiffs nonsuited[9] their state-court action. *Id.* at 335–36. Subsequently, on October 2, 2014, the plaintiffs filed this lawsuit. Doc. 1, Compl. In the plaintiffs' Fourth Amended Complaint, filed on August 8, 2016, the plaintiffs accuse the defendants of 1) infringing a federally registered service mark under 15 U.S.C. § 1114(1); 2) statutory infringement and false designation of origin under 15 U.S.C. § 1125; 3) violating the Anticybersquatting Consumer Protection Act, specifically 15 U.S.C. § 1125(d); 4) unfairly competing with the plaintiffs under 15 U.S.C. § 1125(a); 5) trademark infringement under Texas law; 6) unfair competition under Texas law; 7) unjust enrichment under Texas law; and 8) false advertising under Texas law. Doc. 130, Fourth Am. Compl., ¶¶ 104–94. And the plaintiffs accuse Jackson under Texas law of 1) unfair competition by misappropriation; 2) misappropriating trade secrets; 3) breach of contract; and 4) tortious interference with prospective business relations. *Id.*

On April 21, 2017, the defendants filed their First Amended Answer, Defenses, and Counterclaims in which they generally denied the plaintiffs' factual allegations and raised numerous legal and equitable defenses. Doc. 131, Defs.' First Am. Answer, Defenses, & Countercls. The defendants also counterclaimed that the plaintiffs committed 1) abuse of process, 2) tortious interference with business relations, 3) defamation, and 4) federal copyright infringement. *Id.* at ¶¶ 230–74. The defendants also ask the Court to cancel TLI's federally registered marks and for

---

[9] In Texas courts, "[a]t any time before the plaintiff has introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit." Tex. R. Civ. P. 162. A "non-suit" is a plaintiff's voluntary dismissal of a suit without prejudice. *Paselk v. Rabun*, 293 S.W.3d 600, 605 n.3 (Tex. App.—Texarkana 2009, pet. struck).

attorney fees. *Id.* at ¶¶ 258–67.[10]

Now, parties on both sides have defensively moved for partial summary judgment. Jackson asks the Court to grant him summary judgment on the plaintiffs' state-law claims against him. Doc. 180, Jackson's Mot. Partial Summ. J. And the plaintiffs ask the Court to grant summary judgement in their favor on the defendants' counterclaims and equitable defenses. Doc. 177, Pls.' Mot. Partial. Summ. J.. The plaintiffs' federal claims against the defendants are not the subject of either of the motions before the Court.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). So the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the movant has produced evidence on an element or claim or alleged the non-

---

[10] The defendants brought a free-standing counterclaim for attorney fees under 17 U.S.C. § 505, but they have dropped it.

movant has no evidence, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim" to show that a fact issue exists. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). And although the Court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists, *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000), mere "metaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not save a non-movant from summary judgment, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (internal citations and quotation marks omitted).

## III.

## ANALYSIS

A.   *Robert Jackson's Motion for Partial Summary Judgment on the Plaintiffs' State-Law Claims Against Him*

The plaintiffs claim that by using TLI's customer lists and pricing information to compete with TLI, Jackson committed

1.   Unfair competition by misappropriation;

2.   Misappropriation of trade secrets;

3.   Breach of contract; and

4.   Tortious interference with prospective business relations.[11]

Doc. 130, Fourth Am. Compl., ¶¶ 138–82.

But in his motion for summary judgment, Jackson claims the plaintiffs have failed to present

---

[11] The plaintiffs accused Jackson also of conversion, but they dropped their conversion claim. Doc. 178, Pl. Mot. Partial Summ. J. Br., 21.

evidence that Jackson used TLI's customer list, Doc. 182, Jackson's Mot. Partial Summ J. Br.,

¶¶ 26–36, and he presents as summary-judgment evidence his own sworn declaration in which he

denies that he used TLI's customer lists and claims to have developed Magnovo's business with TLI's

clients via personal relationships, websites, and search engine optimization.[12]   Doc. 181, App'x to

Jackson's Mot. Partial Summ. J., ¶¶ 6–12.

For their part, the plaintiffs respond with summary-judgment evidence that they claim creates

a fact issue regarding whether Jackson used TLI's customer list. The plaintiffs have attached to their

motion evidence that

- Colette Martin, a Magnovo colleague of Jackson's who also left TLI, testified that, while Jackson was a TLI independent contractor, he had access to TLI's customer list, customer-contact information, pricing list, training materials, and other confidential information, Doc. 188-5, App'x to Pls.' Summ. J. Resp., Ex. D, 33–34;
- while Jackson was a TLI independent contractor, Jackson arranged to conduct seminars for at least three of TLI's customers—Novartis Consumer health, Inc., Royal Caribbean Cruise Line, and StatOil Gulf Services—after leaving TLI, Doc. 188-6, App'x to Pls.' Summ. J. Resp., Ex. E, 45, 56–62, 66–69, 88–90, 92;
- two of the customers to which Jackson presented seminars shortly after leaving TLI are on TLI's customer-list excerpt, Doc. 188-14, App'x to Pls.' Summ. J. Resp., Ex. M, 310;
- after leaving TLI, Jackson emailed Colette Martin a list of his contacts, Doc. 188-2, App'x to Pls.' Summ. J. Resp., Ex., A, all of which are on TLI's customer list, Doc. 188-14, App'x to Pls.' Summ. J. Resp., Ex. M;
- all of the customer contacts on the disclosed excerpt of TLI's list, Doc. 188-13, App'x to Pls.' Summ. J. Resp., Ex. L, appear also on Magnovo's customer list, Doc. 188-14, App'x to Pls.' Summ. J. Resp., Ex. M'
- on both TLI's and Magnovo's customer lists, one customer entry lists the individual contact only as Rachel, and on both TLI's list, Doc. 188-13, App'x to Pls.' Summ. J. Resp., Ex. L, 293, and Magnovo's list, Doc. 188-14, App'x to Pls.' Summ. J. Resp., Ex. M., 309, the entry lacks a last name for Rachel; and
- proposals Jackson produced, Doc. 188-12, App'x to Pls.' Summ. J. Resp., Ex. K, reveal that Jackson sent 500 proposals to over 200 companies on the plaintiffs' customer list, Doc. 188-

---

[12] The plaintiffs complain that Jackson's declaration is not summary-judgment evidence. Doc. 189, Pls.' Summ. J. Resp, 9–12. But resolving the plaintiffs' objection would not change the outcome because fact issues remain even if the Court considers Jackson's declaration.

14, App'x to Pls.' Summ. J. Resp., Ex. M.

Accepting as true the parties' summary judgment evidence and making all reasonable inferences in favor of the non-movant plaintiffs, the Court concludes that the plaintiffs have created a fact issue as to whether Jackson used TLI's customer list.

Because a fact issue remains as to whether Jackson used TLI's customer lists, fact issues preclude summary judgment on all four of the plaintiffs' state-law claims.[13] Unfair competition by misappropriation requires the plaintiff to show that the defendant used a product the plaintiff created through time, labor, skill, and money in competition with the plaintiff, thereby gaining a special advantage in that competition. *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 839 (5th Cir. 2014). And misappropriation of trade secrets requires the plaintiff to show that the defendant used the plaintiff's trade secret. *Spear Mktg., Inc., v. Bancorp So. Bank*, 791 F.3d 586, 600 (5th Cir. 2015). Because both misappropriation claims require evidence that the defendant used the plaintiff's trade secrets and there is a fact issue as to whether Jackson used TLI's customer list, the Court denies summary judgment on the plaintiffs' misappropriation claims.

Breach of contract requires the plaintiff to show that the defendant breached a contract between the plaintiff and defendant. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007). The TLI independent-contractor agreement forbade Jackson from using the customer list. So because there is fact issue as to whether Jackson used TLI's customer list, there is a fact issue as to whether he breached his contract with TLI.

And tortious interference requires the plaintiff to show that the defendant engaged in

---

[13] These four torts have other elements. The Court will discuss only the elements Jackson challenges.

independently tortious or otherwise unlawful conduct. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). The plaintiffs have created a fact issue as to whether Jackson wrongfully used TLI's customer list to compete against TLI, which would arguably be tortious and in breach of TLI's independent-contractor agreement. Thus, a fact issue remains on the plaintiffs' tortious interference claim.[14]

B.   *The Plaintiffs' Motion for Partial Summary Judgment on the Defendants' Counterclaims and Equitable Defenses*

The defendants have raised counterclaims and equitable defenses against the plaintiffs. They counterclaim that the plaintiffs have committed abuse of process, defamation, and federal copyright infringement, and they counterclaim that the Court should cancel TLI's build-a-bike trademarks, which are the subject of the plaintiffs' federal trademark claims against the defendants. And as equitable defenses to the plaintiffs' federal trademark claims, the defendants raise estoppel, waiver, and unclean hands. The plaintiffs have moved for summary judgment on all of the defendants' counterclaims and equitable defenses, contending that the defendants have presented insufficient

---

[14]Jackson also unpersuasively posits that TLI has failed to produce evidence that he used TLI's customer list because TLI has not presented any direct evidence that he actually copied or downloaded TLI's customer list. Doc. 182, Jackson's Mot. Partial Summ J. Br., ¶¶ 27, 29, 33, 35. But, as TLI contends, courts have recognized that direct evidence of industrial espionage will rarely be available in trade-secret cases and have therefore allowed plaintiffs to show defendants used their trade secrets by showing that the defendants had access to the trade secret and that the defendants' products were similar to the plaintiffs. *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005). In other words, a non-movant can survive summary judgment by presenting circumstantial evidence that the movant used the non-movant's trade secret. *Vianet Group PLC v. Tap Acquisition, Inc.*, No. 3:14-cv-3601-B, 2016 WL 4368302, at *21 n.19 (N.D. Tex. August 16, 2016).

Although this case does not involve products, as did *Stratienko*, the reasoning in that case supports denying summary judgment here. Presenting evidence of access and similarity is just another way of presenting evidence from which a jury could reasonably infer that the defendant used the plaintiffs' trade secret. And the plaintiffs have presented circumstantial evidence from which a jury could reasonably infer Jackson used TLI's customer list. Thus, the Court denies Jackson's motion for partial summary judgment.

evidence to create fact issues on any of their counterclaims and defenses.

1.    Abuse of Process

To prevail on an abuse-of-process claim, one must prove that 1) the defendant made an illegal, improper, or perverted use of the process, 2) the defendant had an ulterior motive or purpose in exercising such illegal, improper, or perverted use of the process, and 3) the plaintiff suffered damage as a result. *Breitling v. LNV Corp.*, No. 3:15-cv-0703-B, 2015 WL 5896131, at *6 (N.D. Tex. Oct. 5, 2015). To fulfill the damages element, the plaintiff must prove damages other than those incidental to the filing of a lawsuit, which means asking for attorney fees alone will not suffice. *RRR Farms Ltd. v. Am. Horse Prot. Ass'n*, 957 S.W.2d 121, 134 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). Rather, the plaintiff must show a wrongful seizure of property or an actual interference with the person. *Id.*

Here, as the plaintiffs contend, the defendants have presented no evidence that they suffered a special injury. They claim only attorney fees spent responding to the plaintiffs' legal maneuvering. Because a claimant cannot rely on damages incidental to the filing of a lawsuit to fulfill the damages element of an abuse-of-process claim, the defendants' abuse-of-process claim fails. Thus, the Court grants the plaintiffs' summary judgment on the defendants' abuse-of-process counterclaim.

2.    Defamation

To prevail on a defamation claim one must prove that 1) the defendant published a statement 2) that was defamatory concerning the plaintiff 3) while acting with either actual malice if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.

1998). Some statements are so obviously hurtful to a plaintiff's reputation that they are considered defamation per se—that is, defamatory as a matter of law. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). Statements asserting that a person committed a crime are per se defamatory. *In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015). But if an ordinary reader could interpret a statement in more than one way—such as a way in which the statement would be defamatory per se and a way in which the statement would not—the statement is not defamatory per se. *See Hancock*, 400 S.W.3d at 66 ("If the court determines that a statement is ambiguous or of doubtful import, the jury should determine the statement's meaning."). Whether a statement is defamatory per se is a question of law. *Lipsky*, 460 S.W.3d at 596. If a court finds a statement to be defamatory per se, the jury may presume general damages, including for loss of reputation and mental anguish. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). But, unless the plaintiff proves actual damages, a finding that a statement is defamatory per se entitles a plaintiff only to nominal damages. *Id.* Defamation that is not per se is *per quod*. To prevail on claim of defamation *per quod*, a plaintiff must prove the statement actually harmed the defendant's reputation. *In re Jennings*, 203 S.W.3d 32, 36 (Tex. App.—San Antonio, orig. proceeding). A person must bring a defamation claim within one year from the date on which the defendant made the alleged defamatory statements. Tex. Civ. Prac. & Rem. Code § 16.002(a).

The plaintiffs contend that the applicable statute of limitations bars part of the plaintiffs defamation claim, and they argue that, as a matter of law, the statements not barred by the statute of limitations are not defamatory per se. And because the accused statements are not defamatory per se, the plaintiff's argument continues, the defendants' defamation claim cannot proceed because claims for defamation *per quod* require evidence of damages, none of which the defendants have

presented.

TLI is correct that the statute of limitations defeats most of the defendants' defamation claim. The defendants filed their counterclaims on September 16, 2015, Doc. 67, Answer, so they cannot base a defamation claim on any statement made before September 16, 2014. But the defendants complain of several statements made before September 16, 2014. Doc. 185, Defs.' Summ. J. Resp., ¶¶ 7–10. The Court grants the plaintiffs summary judgment on the defendants' defamation claim insofar as the claim relies on statements made before September 16, 2014.

After applying the statute of limitations, the only remaining alleged defamatory statements are in an April 3, 2015 email from Staneart to Colette Martin, who, like Jackson, moved from TLI to Magnovo. Doc. 186-6, App'x to Defs.' Summ. J. Resp., Ex. F. In the email, Staneart recounts to Martin investigations of Jackson and Magnovo's conduct and discusses Staneart and TLI's filing of lawsuits against Jackson and Magnovo. *Id.* The defendants claim the following statements made by Staneart defamed Jackson:

- "[The FBI agents] were most interested in the number of Novartis contracts that you claimed that Jackson had delivered compared to the number of Novartis contracts that he turned in as a contractor for TLI. That particular crime is called Criminal conversion, and it is a form of Embezzlement." *Id.* at 83.
- "They also took note of all the references (quotes from Magnovo clients) that you included in your proposals (especially the one that referenced Connie and Bill). (That is a form of fraud)." *Id.*

Jackson claims these statements defamed him because they impute to him crimes.

But in context, these sentences do not clearly amount to an assertion that Jackson committed crimes. And courts must read allegedly defamatory statements in context. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). The sentences are part of a larger account of Staneart's efforts to

initiate civil and criminal proceedings against Jackson and Magnovo. In the part of that account

containing the above sentences, Staneart discusses the FBI's interest in certain conduct—namely,

the "turning in" of Novartis contracts and references in proposals. So even though Staneart mentions

the names of crimes—conversion and fraud—an ordinary reader could interpret the statements on

which Jackson bases his defamation claim to mean only that the FBI was trying to determine whether

Jackson and Magnovo's conduct was actually criminal. *See Hancock*, 400 S.W.3d at 66 (explaining

that if "the court determines that a statement is ambiguous or of doubtful import" from an "ordinary"

reader's perspective, "the jury should determine the statement's meaning."). Thus, because an

ordinary reader could give the statements a meaning that is not per se defamatory, the Court cannot

characterize the statements as defamatory per se.

Because the statements are not defamatory per se, the defendants' defamation counterclaim

fails. The defendants cannot survive this motion on a claim for defamation *per quod* because they

have presented no evidence that any of the plaintiffs' allegedly defamatory statements actually

harmed the defendants' reputations. Thus, the Court grants the plaintiffs' motion for summary

judgment on the rest of the defendants' defamation claim.

3.    Cancellation of TLI's Trademarks

A trademark is "any word, name, symbol, or device, or any combination thereof—used by a

person . . . to identify or distinguish his or her . . . unique product, from those manufactured or sold

by others and to indicate the source of the goods." 15 U.S.C. § 1127. Trademark owners can apply

to have their trademarks registered on the Principal Register. *Id.* § 1051. Even marks that are

descriptive will be granted registration if they have acquired distinctiveness. *Id.* § 1052(f).

Distinctiveness is the quality of being associated in consumers' minds with a particular source. 1 Trademark Registration & Prac. § 7:9. "The Director [of the USPTO] may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f). A mark on the principal register is strongly presumed to be valid. *Id.* § 1057(b). This presumption of validity includes the presumption that the registered mark had acquired distinctiveness at the time of its registration. *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009).

A party sued for infringing a registered mark may defend herself by asking the court to cancel her accuser's registration. 15 U.S.C. § 1064. If a person seeks cancellation within five years of a mark's registration, "[a]ny ground that would have prevented registration in the first place qualifies as a valid ground for cancellation." *Id.* So a court can cancel a mark that lacked distinctiveness when it was registered. Because of the strong presumption of distinctiveness that registration carries, the party seeking cancellation bears the burden of persuasion in cancellation cases. *Cold War Museum, Inc.*, 586 F.3d at 1356. She must prove by a preponderance of the evidence that the registered mark lacked distinctiveness when it was registered. *Id.* A party seeking cancellation faces also a burden of production. *See id.* at 1359 (noting that party seeking cancellation has the "initial burden of establishing a prima facie case"). She must first make out a prima facie case that the mark lacked distinctiveness when it was registered—that is, evidence that the registrant's use of the mark in the five years before registration was not substantially exclusive and continuous. 15 U.S.C. § 1052(f).

- 16 -

Once the party seeking cancellation has presented evidence that the mark lacked distinctiveness, the burden of production shifts to the mark's owner to present evidence that the mark was distinctive when registered. *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 883 (8th Cir. 2014). Only then will the court weigh the evidence and determine whether the party seeking cancellation has met her burden of persuasion. *Id.*

The plaintiffs contend that because the defendants have failed to present any evidence that the plaintiffs' mark lacked distinctiveness when it was registered, the defendants have failed to present a prima facie case for cancellation, and the Court should therefore grant the plaintiffs summary judgment. Doc. 177, Pls.' Mot. Partial Summ J. Br., 21.

The defendants respond in three ways. First, they claim to "have produced evidence of numerous companies' use of "build a bike" to identify their team building services that involve bike building for charitable purposes." Doc. 185, Defs.' Summ. J. Resp., 11. The citation accompanying this sentence is to a fifty-seven-page exhibit in the appendix of the defendants' response to the plaintiffs' motion for summary judgment. *Id.* at 11. The exhibit is organized in no discernable way, includes untitled lengthy lists, and displays numerous web pages many of which display no dates—even though the relevant time period is the five years preceding registration. *See* Doc. 186, App'x to Defs.' Summ. J. Resp., Ex. T. In their briefing, the defendants give no examples of other companies' uses of "build a bike" in the five years before TLI registered the mark on June 3, 2014, nor do they explain any of the evidence the exhibit contains. Presumably, the defendants expected the Court not only to peruse their unorganized fifty-seven-page exhibit in search of evidence supporting their argument but also determine how the evidence connects to the elements of a

cancellation claim—elements the defendants do not actually mention in their briefing.

But "the nonmovant must identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim." *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (citation and quotation marks omitted). The Court has no duty to "sift through the record in search of evidence to support the nonmovant's opposition to summary judgment." *Id.* (citation and quotation marks omitted). The Court will not condone the practice of lawyers foisting their briefing responsibilities on courts. Thus, the defendants' assertion that they "have produced evidence of numerous companies' use of 'build a bike' to identify their team building services" carries no weight.

Second, the defendants contend that a trademark lawsuit filed by TLI "shows that others are using the BUILD-A-BIKE mark and have been doing so for quite sometime." Doc. 185, Defs.' Summ. J. Resp., 12. But the defendants' reliance on this lawsuit is misplaced. The issue here is not merely whether others have used TLI's mark but whether, in the five years preceding the mark's registration, TLI's use of the mark was substantially exclusive and continuous. 15 U.S.C. § 1052(f). Though TLI filed the lawsuit in 2012—which is during the relevant time period—a single potentially infringing use of a mark is not sufficient to make out a prima facie case that TLI's mark lacked distinctiveness when it was registered. *Cottonwood Fin. Ltd. v. Cash Store Fin. Servs.*, 778 F. Supp. 2d 726, 752 (N.D. Tex. 2011).

And third, the defendants argue that they have presented evidence that Staneart filed a fraudulent application to register the build-a-bike mark and that the fraudulent application warrants cancellation. Doc. 185, Defs.' Summ. J. Resp., 10. But this argument fails, too. Although committing

fraud in an application to register a mark is grounds for cancellation, 15 U.S.C. § 1064(3), the requirements for obtaining cancellation based on fraud on the USPTO are difficult to meet. *In Re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). The Federal Circuit has said, "[A]bsent the requisite intent to mislead the USPTO, even a material representation would not qualify as fraud under the Lanham Act warranting cancellation." *Id.* at 1244. Rather the party seeking cancellation must show both a subjective intent to deceive and a material representation. *Id.* at 1245.

The defendants claim that Staneart defrauded the USPTO because he knew other companies had been using the build-a-bike mark when he filed his build-a-bike application. Doc. 185, Def. Summ. J. Resp., 10. As evidence that Staneart knew his application was false, the defendants present Staneart's declaration to the USPTO and some emails Staneart wrote. Doc. 186, App'x to Def. Summ. J. Resp., Ex. R; *Id.*, Ex. Q. In the declaration, Staneart attested that "no other person, firm, corporation, or association has the right to use the mark in commerce." *Id.*, Ex. R, 133. And in the emails, Staneart discusses bike team-building events hosted by companies other than TLI. *Id.*, Ex. Q. But the emails do not show that Staneart knew of other companies who had the *right* to use the build-a-bike *mark*. Rather, Staneart mentions companies he thought were "infringing our trademarks," *Id.*, Ex. Q, 129, which shows that, even if he knew another company was using something like the build-a-bike mark, he did not think others had the right to use the mark. Thus, because the defendants have presented no evidence that Staneart intended to mislead the USPTO, the Court grants the plaintiffs summary judgment on the defendants' cancellation claim.

4.     Copyright Infringement

The defendants claim that TLI committed copyright infringement by "framing" Magnovo's

copyrighted content. In its motion for summary judgment, TLI responds in two ways. First, TLI claims that, as a matter of law, framing cannot constitute copyright infringement. And second, TLI claims that the defendants have failed to present any evidence of damages.

*a. Copyright Infringement and Framing*

Owners of copyrights have the exclusive rights to publicly display copies of their copyrighted works. 17 U.S.C. § 106(5). "To display a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." *Id.* § 101. And to publicly display a work is "to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.* Federal law gives copyright owners a cause of action to use against copyright infringers. *Id.* § 501. Copyright owners can seek injunctions, damages, and attorney fees in copyright-infringement cases. *Id.* §§ 502, 503, 505.

The defendants accuse the plaintiffs of infringing their rights in "Copyrighted Works" by causing the plaintiffs' websites[15] to "frame" the defendants' websites. Doc. 185, Defs.' Summ. J. Resp., 14. By framing the copyrighted works, the defendants contend, the plaintiffs displayed the defendants' works. *Id.* at 15. The defendants do not reveal their copyrighted works in their counterclaim but do in their response to the plaintiffs' motion for summary judgment: the Bicycle-

---

[15] The defendants accuse the following TLI domain names of framing their copyrighted website: bicycle-team-building.org, bicycles-team-building.com, bicycleteambuilding.org, and bicycleteambuildings.org.

Team-Building-Events.com website and Magnovo Photo 1.[16] Doc. 185, Defs.' Summ. J. Resp., 13.

Some technical background is necessary to explain framing. Webpages consist of data. This data is stored on computers. When a user instructs her web browser to access a webpage, the web-browser software interprets code stored on the computer that stores the website's data and displays the information as a webpage. But a webpage can include code that instructs the web browser to retrieve code from another computer and to display that information at the same time as information retrieved from the first computer. In such a situation, the user would see the website she has visited framing the content the website instructed the web browser to retrieve from the other computer.[17]

The facts of this case illustrate framing. The defendants have alleged, and the plaintiffs do not dispute, that when a user visited one of TLI's websites, TLI's website instructed the user's browser to display Magnovo's website under TLI's web address. Thus, TLI's content framed Magnovo's.

The plaintiffs respond simply that framing is not copyright infringement.

But the plaintiffs are incorrect; they publicly displayed Magnovo's copyrighted works. By framing Magnovo's copyrighted works, the plaintiffs displayed the works by "show[ing] a copy" of the works via a "process." 17 U.S.C. § 101. That process was the instructing of users' web browsers to display Magnovo's copyrighted works when those users visited one of the accused TLI domain names. And the plaintiffs displayed the copyrighted works publicly. By instructing users' web browsers to

---

[16] The defendants discuss also another Magnovo website: charity-team-building-events.com. They contend the defendants framed this website as well. But why the defendants discuss this website is unclear. They never claim to have copyrighted it.

[17] The Court has taken this account from the Ninth Circuit's scholarly opinion in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155–56 (9th Cir. 2007).

display Magnovo's content upon accessing TLI's publicly-accessible websites, the plaintiffs "transmit[ed] . . . a display of the [defendants'] work . . . to the public." *Id.* Thus, by framing the defendants' copyrighted works, the plaintiffs impermissibly displayed the works to the public. *See Id.* § 106(5) (conferring on copyright owner the exclusive right to display copyrighted works).

In support of their proposition that framing is not copyright infringement, the plaintiffs rely on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). *Perfect 10* involved Google Image Searches and nude photos. *Id.* at 1155–57. Perfect 10 maintained members-only websites on which paying members could view Perfect 10's copyrighted nude photos. *Id.* at 1157. Some websites, however, copied Perfect 10's photos and displayed them online without Perfect 10's permission. *Id.* Perfect 10 argued that Google's Image Search violated its rights to display its copyrighted images. *Id.* When the Ninth Circuit decided the case, a Google Image Search would return a page full of images.[18] *Id.* at 1155–57. Clicking on one of the images would cause the Google webpage to frame the content from the webpage containing the clicked-on image; Google would instruct the user's browser to display the website within Google's webpage. *Id.* The Ninth Circuit held that Google's framing of infringing images was not copyright infringement, reasoning that "Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the . . . image" and that "[p]roviding these HTML instructions is not equivalent to showing a copy." *Id.* at 1160–61. Rather, Google merely provided links for users to access the websites displaying infringing photos.[19]

---

[18] The images returned by a Google Image Search are called thumbnails. Google lifted these images from the websites displaying them and stored low-resolution versions of the images on its servers. The Ninth Circuit held that Google's displaying of the thumbnails was copyright infringement. *Id.* at 1159–60.

[19] The Ninth Circuit left open the possibility that Google's framing practices could be contributory infringement. *Id.* at 1161. But Jackson and Magnovo have not alleged contributory infringement.

*Id.*

The plaintiffs argue that their websites are just like Google. Doc. 178, Pls.' Mot. Partial Summ. J. Br., 28. Like Google, they contend, they have no copies of Magnovo's copyrighted material. *Id.* at 28–29. Rather, they say their website merely directs users to Magnovo's material. *Id.*

But the plaintiffs' reliance on *Perfect 10* is misplaced. First, TLI's conduct is factually different from Google's. Google did not actually display infringing images but instead provided links for users to access sites that displayed infringing images. *Perfect 10*, 508 F.3d at 1160–61. Although the infringing content appeared under a Google banner, the user was essentially navigating to an infringing website to view Perfect 10's photos. The same is not true of users who visited the accused TLI websites. Upon visiting one of the TLI sites, a user would necessarily see Magnovo's content. Unlike Google, TLI did not merely provide a link by which users could access Magnovo content but instead displayed Magnovo's content as if it were its own. Doc. 186, App'x to Defs.' Summ. J. Resp., Ex. X, 255.

Second, the plaintiffs' argument that they cannot have committed copyright infringement because they have no copies of Magnovo's works lacks merit. And to the extent *Perfect 10* makes actual possession of a copy a necessary condition to violating a copyright owner's exclusive right to display her copyrighted works, the Court respectfully disagrees with the Ninth Circuit. *See Flava Works, Inc. v. Gunter*, No. 10-C-6517, 2011 WL 3876910, at *4 (N.D. Ill. Sept. 1, 2011) (also disagreeing with the Ninth Circuit). The text of the Copyright Act does not make actual possession of a copy of a work a prerequisite for infringement. To display a work, someone need only show a copy of the work; a person need not actually possess a copy to display a work. 17 U.S.C. § 101. And

- 23 -

to display a work publicly, a person need only transmit or communicate a display to the public. *Id.* Again, the person need not possess the display. *Id.* For example, a person that went into a movie theater and used a video camera connected to the internet to broadcast a movie to the public would clearly be committing copyright infringement even though the person did not herself have a copy of the movie. Essentially, TLI's framing scheme is like a live feed of Magnovo's copyrighted website. Whatever a user would see if she accessed Magnovo's website, she would see if she accessed one of the accused TLI websites. Thus, because the defendants do not have to show that the plaintiffs had a copy of Magnovo's works, their copyright-infringement claim does not fail as a matter of law.

Given that the defendants' copyright claim does not fail as a matter of law, the next question is whether the defendants have met their summary-judgment burden of production by presenting evidence that the plaintiffs wrongfully framed Magnovo's copyrighted works.

They have. The defendants attached to their motion an affidavit executed by April Jackson, Robert Jackson's wife. Doc. 186, App'x to Defs.' Summ. J. Resp., Ex. X. A non-movant can survive summary judgment by presenting affidavits so long as the affidavits are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Ms. Jackson's affidavit meets these requirements. She attests that she performs "certain duties for Magnovo including but not limited to monitoring the Magnovo websites for unusual activity and the like" and that she is "familiar with the copyrights owned by Magnovo." Doc. 186, App'x to Defs.' Summ. J. Resp., Ex. X, 254. She goes on to say that the plaintiffs registered four domain names and "caused such registered domains to 'frame' Magnovo's website located at http://bicycle-team-building-events.com/, whereby

- 24 -

the full content of Magnovo's Bicycle Team building website was displayed within and under Plaintiffs' registered domain name." *Id.* at 255.

The plaintiffs' argument that the Court should ignore Ms. Jackson's affidavit fails. They rely on a Fifth Circuit case that states "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2738 (1983)). The *Galindo* affidavit said a party "[was] not engaged in the business of selling sawmill trimmers." But as the Fifth Circuit read the applicable law, "determining whether one is engaged in the business of selling depends on an analysis of the totality of the circumstances surrounding the sales efforts." *Galindo*, 754 F.2d at 1221. Thus, the Fifth Circuit disregarded the affidavit's statement because it was a legal conclusion unsupported by any reference to specific sales activities. *Id.* But here, Ms. Jackson does not state a legal conclusion but describes how Magnovo's content was displayed under TLI's domain names. She claims actually to have observed the accused conduct and merely describes what she saw.

Because the defendants' framing claim does not fail as a matter of law and because they have presented evidence in support of their framing claim, the Court denies the plaintiffs' motion for summary judgment on the merits of the defendants' copyright-infringement counterclaim.

> *b. Damages for Copyright Infringement*[20]

---

[20] In their reply, the plaintiffs argue also that the defendants are not entitled to injunctive relief on their copyright claim. But a party cannot raise a ground for summary judgment for the first time in its reply. *Doe ex rel. Doe v. Beaumont Ind. Sch. Dist.*, 173 F.3d 274, 299 n.13 (5th Cir. 1999). Thus, the Court declines to consider at this time the plaintiffs' request that the Court deny the defendants' request for injunctive relief.

The defendants seek statutory damages for copyright infringement. Although 17 U.S.C. § 504(c) authorizes damages awards in civil infringement cases, 17 U.S.C. § 412 makes registration of a copyright a prerequisite to seeking damages. "No award of statutory damages . . . shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." *Id.* § 412(2). The effective date of registration is the date of application. *Id.* § 410(d). The plaintiffs argue that § 412 prevents the Court from awarding damages because the defendants have presented no evidence of infringement occurring after the effective registration date of their copyrights. Doc. 178, Pls.' Mot. P. Summ. J. Br., 30.

The plaintiffs are incorrect—but only partly. The defendants claim to have registered two works: Bicycle-Team-Building-Events.com website and Magnovo Photo 1. Doc. 185, Defs.' Summ. J. Resp., 13. Ms. Jackson's affidavit is the only evidence the defendants cite that discusses the two copyrighted works. Ms. Jackson attests that Magnovo first published the copyrighted works on December 5, 2015 and timely filed applications for registration on December 7, 2015 and that TLI's framing of Magnovo's website continued "through at least December 5, 2015." Doc. 186, App'x to Defs.' Summ. J. Resp., Ex. X, 256. So although the evidence indicates infringement after the publishing date but before the registration date, the registration date was within three months of the publishing date. Thus, 17 U.S.C. § 412 allows the defendants to seek statutory damages for any infringement that occurred on December 5, 2015. The defendants cannot seek damages for infringement that occurred after December 5, 2015 because they have presented no evidence that the plaintiffs framed Magnovo's copyrighted content after December 5, 2015. Thus, the Court grants

the plaintiffs' motion for summary judgment in part but denies the motion insofar as it applies to statutory damages from December 5, 2015.

5.    Equitable Defenses

As defenses to the plaintiffs' federal trademark claims, the defendants plead estoppel, waiver, and unclean hands. In their motion for summary judgment, the plaintiffs contend that the defendants have presented insufficient evidence for any of the three defenses to survive summary judgment.

a. Estoppel

To prevail on an estoppel claim, the defendant must prove that 1) the plaintiff knew or should have known of the defendant's use of the trademark, 2) the plaintiff made implicit or explicit assurances to the defendant, and 3) the defendant relied on the assurances. *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). The plaintiffs do not mention the elements of estoppel in their briefing, and the summary-judgment evidence they mention has no discernable connection to the elements of estoppel. Thus, because the defendants have failed to direct the Court to any record evidence supporting their estoppel defense, the Court grants the plaintiffs' motion for summary judgment on the defendants' estoppel defense.

b. Waiver

To establish waiver, the defendant must show that 1) the plaintiff held an existing right, benefit, or advantage; 2) the plaintiff's actual knowledge of the existence of that right, benefit, or advantage; and 3) the plaintiff's actual intent to relinquish that right, or intentional conduct inconsistent with that right. *Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 611 (S.D. Tex. 2014). The

- 27 -

defendants make three waiver arguments.

First, the defendants argue that the plaintiffs waived their right to seek a permanent injunction because they never sought a preliminary injunction. Doc. 185, Defs.' Summ. J. Resp., 19–20. Neither have the defendants cited nor has the Court found any cases supporting the defendants' position. Thus, this argument fails.

Second, the defendants claim that because the independent-contractor agreement allegedly governing Jackson and TLI's relationship did not require contractors to return confidential materials or "define the range of trade secrets that Plaintiffs claim were misappropriated," the plaintiffs have waived their trade-secrets claim. *Id.* at 20. But a party does not have to contract for assurances that its contracting partners will refrain from committing torts in order to bring tort-law claims against those parties. Thus, this argument fails, too.

Third, the defendants contend that the plaintiffs have waived their right to enforce their rights in the build-a-bike mark because the defendants have allowed others to use the mark. *Id.* In support of this argument the defendants rely on two other companies' use of the mark.

The first company is Odyssey. *Id.* The defendants' evidence shows that the plaintiffs knew Odyssey used "build-a-bike" to describe bike-building events. But contrary to the defendants' assertions that the plaintiffs took no action against Odyssey, the plaintiffs sent Odyssey a cease-and-desist letter. Doc. 179-12, App'x to Pls.' Mot. Partial Summ. J., Ex. 11, 226.

The second company is GSF foundation. The defendants argue that the plaintiffs' lawsuit against GSF, in which the plaintiffs claim GSF infringed their rights in the build-a-bike mark, is evidence that the plaintiffs have not "diligently been protecting their trademark." Doc. 185, Defs.'

Summ. J. Resp., 20. But the lawsuit is evidence that the plaintiffs have been diligently protecting their trademark; by filing the lawsuit, the plaintiffs were protecting their rights. Thus, the defendants' third waiver argument also fails

Because the defendants have presented insufficient evidence to create a fact issue on their waiver defense, the Court grants the plaintiffs' motion for summary judgment on this defense.

### c. Unclean Hands

To prevail on an unclean hands defense, the defendant must show that the plaintiffs' wrongful acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Mitchell Bros. Fil Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). The plaintiff's wrongdoing "does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Id.*

The defendants argue that the plaintiffs come to the Court with unclean hands because they filed a fraudulent trademark application to claim the Magnovo mark. Doc. 185, Defs.' Summ. J. Resp., 19. The defendants' argument fails for two reasons. First, the plaintiffs' filing of an allegedly fraudulent trademark application is unrelated to this proceeding, so the application does not "affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Mitchell Bros.*, 604 F.2d at 863. And second, the defendants do not claim to have been injured by the plaintiffs' filing of the application. Thus, because the defendants have presented no evidence supporting their unclean-hands defense, the Court grants the plaintiffs' motion for summary judgment on the defendants' unclean-hands defense.

## IV.

## CONCLUSION

The Court **DENIES** Jackson's motion for partial summary judgment (Doc. 180) on the plaintiffs' state-law claims against him, and the Court **GRANTS** the plaintiffs' motion (Doc. 177) for partial summary judgment except insofar as the motion applies to the defendants' copyright counterclaim. As to the defendants' copyright counterclaim, the Court **DENIES** the plaintiffs' motion for partial summary judgment on the merits of the defendants' copyright counterclaim and **GRANTS** in part and **DENIES** in part the plaintiffs' motion insofar as the motion applies to the damages element of the copyright counterclaim. Based on the evidence the defendants presented, the defendants may seek statutory damages only for infringement that occurred on December 5, 2015.

**SO ORDERED.**

**SIGNED: November 22, 2016.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE